760 A.2d 294

**Hugh F. HILL, III, et al.**

v.

**Kevin H. WILSON.**

**No. 00790, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Oct. 4, 2000.

474

Natalie C. Magdeburger (Leora R. Simantov and Whiteford, Taylor & Preston, L.L.P. on the brief), Towson, for appellants.

Kathleen Howard Meredith (David J. Wildberger and Iliff & Meredith, P.C. on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and DAVIS and HOLLANDER, JJ.

MURPHY, Chief Judge.

In the Circuit Court for Baltimore City, Kevin Wilson, appellee, filed a medical malpractice action against Dr. Hugh Hill and Emergency Associates, Inc., appellants.[1] A jury

---

1. Appellee originally filed a claim with the Health Claims Arbitration Office, asserting that appellants and Good Samaritan Hospital of Maryland, Inc. ("Good Samaritan") were negligent during his August 30, 1994 trip to the emergency room. The complaint asserted that Dr. Hill was the agent, actual or apparent, of Emergency Physicians Associates, P.A. and Good Samaritan Hospital. The parties agreed to "opt out" of the arbitration. In the circuit court, Good Samaritan filed a Motion for Summary Judgment on the basis that appellants were not its agents. That motion was granted.

(Hon. Thomas Noel presiding) returned a verdict in favor of appellee, and appellants now present the following questions for our review:

I. Did the trial court err in permitting impeachment testimony by Dr. Hill regarding Dr. Hill's lectures and writings related to risk management and did the trial court err by denying a new trial on that basis?

II. Did the trial court err by excluding testimony of appellants' expert witness, Dr. Orlando, regarding appellee's broken chair, because the trial court erroneously determined that the matter had not been discussed in Dr. Orlando's deposition, and did the trial court err by denying appellants' motion for a new trial?

III. Did the trial court err by failing to grant appellants' motion for summary judgment regarding appellee's contributory negligence, and did it further err by denying appellants' motion for judgment, motion for a new trial and judgment notwithstanding the verdict on the issue?

IV. Did the trial court err by giving a jury instruction regarding the patient's ability to rely on statements by a doctor that were not a complete statement of the law, because it did not state that a patient's reliance must be reasonable and justified in order for a patient to satisfy his obligation to exercise reasonable care in safeguarding his own health and safety?

For the reasons that follow, we shall answer "no" to each question and affirm the judgment of the circuit court.

## Factual Background

Appellee has been paralyzed from the waist down since 1987. On August 30, 1994, he went to the emergency room at Good Samaritan Hospital, complaining of nausea, cloudy urine, and an ulcer on his lower back. Dr. Hill was his emergency room physician. According to appellee, Dr. Hill did not

inquire about the duration or history of the ulcer, did not "manually palpate or otherwise touch the ulcer," and made an incorrect diagnosis on the basis of an inadequate examination. Appellee testified that Dr. Hill merely lifted the bandage that appellee had placed on the ulcer at home, glanced at the sore and placed the bandage back on, commenting to appellee that the ulcer was "not your problem."

Dr. Hill had no independent recollection of appellee's visit, and his testimony was based on the notes he wrote on appellee's chart at that time. According to Dr. Hill, his examination revealed that appellee had a "large sacral ulcer without surrounding erythema," and he diagnosed appellee as suffering from a urinary tract infection. He prescribed antibiotics to last 10 days, and instructed appellee to (1) make an appointment with a plastic surgeon "when available" for treatment of the ulcer, (2) obtain a reculture of the urine in two weeks, and (3) "see your doctor if worse." Even though appellee's record contained no express reference to what kind of examination was performed, Dr. Hill testified that he performed a complete evaluation of appellee because his standard practice is to perform such an evaluation.

Appellee testified that he followed Dr. Hill's advice. When he got home, he made an appointment with a plastic surgeon, Dr. Orlando, whose first available appointment was two weeks away. He also took the prescribed medicine and cleaned and dressed the ulcer every day. Approximately a week after his emergency room visit,[2] appellee noticed that an unusual odor was coming from the ulcer.[3] He returned to the hospital on September 14, 1994.

---

2. At his deposition, appellee stated that he was unsure of the exact dates. During trial, he claimed that the drainage began after the first week and that he noticed the odor on September 13th.

3. Appellee testified that, before detecting the odor, he noticed that a clear liquid was draining from the ulcer. Because he had previous experience with draining ulcers that were not infected, appellee realized that liquid draining from the ulcer was part of the healing process.

Upon his arrival, appellee was diagnosed as suffering from a severe infection,[4] and was then admitted. Due to complications from the infection, above the knee amputations had to be performed on both of appellee's legs.

## Discussion

### I. Impeachment of Dr. Hill

Appellants assert that Judge Noel erred in allowing appellee's counsel to cross-examine Dr. Hill about certain of his writings and lectures.[5] Dr. Hill is the author of a chapter in a risk management manual for doctors, and has also lectured on how emergency room medical charts should be prepared and documented from a "risk management or a legal perspective." Appellants filed a Motion in Limine to prohibit the admission of these materials, asserting that the materials were (1) not relevant, and (2) prejudicial to appellants' case. Judge Noel concluded that the materials would be admissible for impeachment purposes, and perhaps on the issue of appellee's contributory negligence, but could not to be used to prove that Dr. Hill breached the standard of care in his treatment of appellee.

During Dr. Hill's cross-examination, several bench conferences took place, the first occurring when Dr. Hill was being cross-examined with respect to his medical credentials. Judge Noel concluded that (1) he was going to deal with the issues raised by the materials on a question to question basis, and (2) appellee's counsel could inquire about the contents of the

---

4. The parties dispute the precise condition of appellee on that date; appellee asserts that he had one ulcer on the lower back, while appellants assert that appellee had two ulcers, one on the base of the spine and the other on the lumbar region of the back.

5. Dr. Hill conceded during cross-examination that he has lectured and written on such subjects as (1) "how a careful and prudent emergency room physician should handle a patient's discharge from the emergency room," and (2) "how a careful and prudent emergency room physician should document an emergency room record."

writings. Appellee's counsel could not, however, use the writings to establish the requisite standard of care, and could not inform the jury that the writings were primarily directed at the goal of avoiding lawsuits.

Counsel for appellee also used the materials to question Dr. Hill on the issue of contributory negligence.[6] In the materials, Dr. Hill had commented that directions to the patient to see your physician for follow-up "as necessary" or "as worse" were insufficient because of a lack of understanding by the patient as to the specific time frame. Because of the notes that Dr. Hill made in appellee's chart, Judge Noel allowed Dr. Hill to be questioned on the apparent inconsistency between what he had documented and what he had advised others to document. Judge Noel explained:

> I cannot let this jury not hear this examination. I think it would be patently unfair to just say that it was written based upon a theory of risk management; therefore, the jury should not hear it. If for no other bottom line reason is that it would demonstrate the defendant's knowledge in this area alone. And on that basis alone, I think it becomes admissible ... Also, *when someone writes something in an area, I think it only fair that they be held accountable to what they write.* Now, if [counsel for appellants] wants to have this jury advised of the purpose of the writing, its intent, the fact that it was written for risk management, and have your client or witness explain it, you can do so. If you prefer the jury not hear anything about the distinction between risk management and standard of care, then I can advise counsel not to delve into that area. But I don't see that once someone writes something that they can say, 'Well, I am not going to have a trier of fact be privy to my writings because I wrote it with a different intent in my mind.' It is the doctor's own writing, and I

---

6. Appellants asserted that appellee was contributorily negligent because he did not seek medical attention as soon as his condition worsened.

think it only appropriate that he be permitted to be cross-examined on what he has written.

(Emphasis added).

We agree with that analysis. During her closing argument, counsel for appellee stated:

Frankly, what I really think Dr. Hill is saying is that he hopes he gave more elaborate discharge instructions than what are written on this record because that is what he should have done. He testified, you'll remember, that he gives lectures and talks to other doctors, and what he tells them is that no patient understands the instruction, 'see your doctor if worse,' or 'see your doctor if not better.' He tells them that discharge instructions must be time and action specific, and he tells them that they should document these time and action specific instructions. But though he tells other doctors that no patient can be expected to understand instructions of the type he gave in this case, he asks you to impose that expectation on Mr. Wilson.

There is nothing unfair in that argument.

■ Appellants claim that the materials were not relevant. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md.Rule 5–401. The materials were relevant to the issue of credibility.

A witness generally may be cross-examined on any matter relevant to the issues, and the witness's credibility is always relevant.

*DeLilly v. State,* 11 Md.App. 676, 681, 276 A.2d 417 (1971). The *DeLilly* Court went on to state that it is proper to allow "any question which reasonably tends to explain, contradict, or discredit any testimony given by the witness in chief, or which tends to test his accuracy, memory, veracity, character or credibility." *Id.* Furthermore, the "scope, range and extent of such interrogation rests in the sound discretion of the trial court." *Kruszewski v. Holz,* 265 Md. 434, 440, 290 A.2d 534 (1972) (citing *Shupe v. State,* 238 Md. 307, 311, 208 A.2d 590

(1965)). We "will only reverse upon finding that the trial judge's determination was 'both manifestly wrong and substantially injurious.'" *Lomax v. Comptroller of Treasury,* 88 Md.App. 50, 54, 591 A.2d 1311 (1991) (internal citations omitted).

■ Judge Noel did not err or abuse his discretion in allowing Dr. Hill to be impeached by his own prior statements, as they were relevant to his credibility as a witness. Maryland law provides that

> ... upon the laying of a proper foundation ... the credit of a witness may be impeached by showing that he has made statements which contradict his testimony in respect to material facts.

*Jenkins v. State,* 14 Md.App. at 5, 285 A.2d 667. As Dr. Hill wrote the manual and lectured accordingly, there was nothing unfair about impeaching him with his own words.

## II. The "Broken" Wheelchair Testimony

■ Dr. Orlando examined appellee on September 16, 1994. During that examination, Dr. Orlando noticed that several ulcers had developed at numerous locations on appellee's body.[7] During his deposition, Dr. Orlando opined that the infected ulcer that necessitated the amputations "developed from a bar which ran across the back of [appellee's] wheelchair." Dr. Orlando was prepared to testify at trial that appellee's wheelchair was "broken." Judge Noel ruled, however, that Dr. Orlando "may comment that the bar rubbed [appellee's] back causing the lumbar ulcer [but could not opine] that the chair was broke."

Appellants contend that Judge Noel should not have prohibited Dr. Orlando from testifying that appellee's wheelchair was "broken." They recognize the well established rule that a trial judge has the power to exclude trial testimony that constitutes a material departure from what the witness testi-

---

7. Appellee contends that these ulcers did not develop until he had been admitted to the hospital.

fied to at deposition. They argue, however, that this rule does not apply to the "broken" wheelchair testimony because (1) appellee never filed a motion to compel discovery of the basis for Dr. Orlando's opinions, and/or (2) although Dr. Orlando did not use the word "broken" during his deposition, "he did tell [appellee's counsel] that the wheelchair was broken." Judge Noel did not agree with those arguments. Neither do we.

Appellee's interrogatories requested that appellants provide the factual basis for any contentions that "any act or omission of Kevin Wilson in any way contributed to the damages he now complains of in this action." Appellants' response asserted that appellee "caused and /or contributed to his alleged injuries by his failure to follow the instructions given to him by his physicians." This answer was never supplemented to include a contention that appellee's injuries were caused by a broken wheelchair.[8] Appellees also propounded the following interrogatory to Dr. Hill:

> *Interrogatory No. 11* : The Defendant is to state the name and professional address of each expert who may be called at the hearing and/or trial hereof, attaching to these Answers copies of each experts curriculum vitae, as well as copies of all reports received. Further, the Defendant is to indicate the specialty and/or subspecialty of each expert named. With respect to each and every expert named, the Defendant is to state in detail the subject matter on which each such witness will testify, the substance of the facts considered and opinions held by each such expert, and the ground/or basis for each opinion.

Dr. Hill answered that

> [t]he naming of expert witnesses will be done in accordance with the Scheduling Order of this Court.

Thereafter Dr. Hill filed a DESIGNATION OF EXPERT WITNESSES in which he advised that

---

**8.** The Interrogatories contained a continuing duty on appellants' part to supplement. See Md.Rule 2–401.

Dr. Orlando is a plastic surgeon who is expected to provide factual testimony and offer opinions on causation. He is expected to testify that there were two separate wounds on Plaintiff's back, that the wounds were not connecting with one another and that the sacral ulcer present on 8/30/94 was not in the same location as the Stage V ulcer found in September, 1994. He will additionally opine that the second ulcer on the iliac crest could have developed between the period when the Plaintiff was seen by Dr. Hill on 8/30/94 and his presentation in September of 1994.

Rather than move for an order compelling discovery of the "ground and/or basis for" Dr. Orlando's opinions, appellee noted Dr. Orlando's deposition. During his discovery deposition, however, Dr. Orlando never testified that the wheelchair was "broken" or in poor condition.[9]

---

9. The specific questioning regarding the chair at the deposition was as follows:

[COUNSEL FOR APPELLEE]: Would you agree with me, Doctor, that given the fact that we have documented on August 30, 1994, a three-inch decubitus ulcer, albeit said in the sacrum, but in the low back area, and we have descriptions until at least the 17th of September of a single large ulcer in the low back area, variously described as lumbar, sacrum and low back, would you disagree with me, Doctor, that those two ulcers are most likely one and the same ... ?

[DOCTOR]: Why would it be that the three-inch sacral ulcer improved and maybe it wasn't three inches, but two and a half, and it was truly a sacral ulcer as described by Dr. Hill and it was noted later to be two, maybe three or four centimeters by the nurses, and **that's separate from his lumbar ulcer which was caused by the traverse bar on his wheelchair**, and that after he was seen in the emergency room in a debilitated condition with poor nutrition he continued sitting in his wheelchair, **and that metal bar that ran across the back of his wheelchair, he rode it right into his back while the other one went on to do reasonably** well. I can't say for sure that there aren't two ulcers back there....

[COUNSEL FOR APPELLEE]: Now, Doctor, in the description of your opinions here there's also a notation that it is your belief that a second ulcer on the iliac crest could have developed between August 30 and September 14, right?

[DOCTOR]: Yes.

[COUNSEL FOR APPELLEE]: Tell me how a large ulcer such as is seen on September 14 could develop over that period of time.

Prior to the introduction of Dr. Orlando's testimony, appellee's counsel expressed concern that the doctor was going to testify to matters not raised in deposition or otherwise disclosed during discovery.[10] This request for a ruling that would confine the witness to opinions expressed during his deposition was the functional equivalent of a motion to sanction appellants for their failure or refusal to provide discover-

---

[DOCTOR]: Very easily. **If you would look at his wheelchair, and I invite you, he had a bar running across the back of his wheelchair that ran right across that area, it ran across the mid to upper lumbar area.**
[COUNSEL FOR APPELLEE:] And how is it that a pressure ulcer could develop and progress to osteomyelitis eating through the vertebral column, how long does it take that to happen?
[DOCTOR:] Two weeks. . . . or more, or less. . . . It's hard to say. It depends on the patient's nutrition, blood supply, it depends on other factors. I mean this fellow is already septic from his urinary tract infection, so there's a lot of things that are going against Kevin at this point and he's very susceptible to developing a pressure ulcer, **and this ulcer developed from a bar which ran across the back of the wheelchair. I remember completely, I was astounded when I saw his wheelchair, because I couldn't understand why anyone would get a pressure ulcer at about the level of the waist of the back. . . .** (Emphasis added).

**10.** During her opening statement, appellants' counsel did not mention the opinion that appellee's wheelchair was broken. She summarized Dr. Orlando's testimony as follows:

I will be calling a number of witnesses in this case. And two of them are going to be very critical to my case, and I'll tell you that ahead of time.

The first one is Dr. Joseph Orlando. I mentioned his name earlier [regarding his involvement with appellee as his plastic surgeon]. Dr. Orlando is and was a doctor who treated Kevin Wilson. He has treated Kevin Wilson for a number of years. He treated Kevin Wilson in 1990. And, interestingly, he is the plastic surgeon who was at the bedside in September when Mr. Wilson returned. And he will provide some very important testimony in this case.

He will tell you that there were two ulcers on Mr. Wilson's back when he returned on the 14th. And he will tell you that the sacral ulcer, the ulcer that Dr. Hill saw on the 30th wasn't infected; and, therefore, it wasn't infected on the 30th. He will tell you what type of education program Mr. Wilson has been through his years of treatment. He will tell you what education program he gave to Mr. Wilson himself on how to take care of himself, and what to look for, and what makes an ulcer infected, and what makes an ulcer not infected, and how to care for those ulcers if they exist.

able information requested in Interrogatory No. 11.[11] "[I]t has long been recognized in Maryland that 'substance rather than the form of the pleading is the controlling consideration.'" *Payne v. Payne*, 132 Md.App. 432, 439, 752 A.2d 1209 (2000), (citing *Lapp v. Stanton*, 116 Md. 197, 199, 81 A. 675 (1911))(internal citations omitted). During a bench conference on this issue, the following discussion took place:

[COUNSEL FOR APPELLEE:] Your honor ... [counsel for appellants] intends to call Dr. Orlando. Dr. Orlando was named as an expert witness in this case, and his deposition was taken. [Counsel for appellants] has hinted that the testimony she expects to elicit from him on the witness stand is somewhat different and more expansive than the testimony he offered under oath at deposition. I have no idea what she is talking about. I object to that. And I think that it would violate fundamental rules of fairness as well as the rules of discovery....

[COUNSEL FOR APPELLANTS:] I talked to Dr. Orlando. There are issues that will come to light at the witness stand that [counsel for appellee] frankly didn't ask about. And I don't think I'm obligated to say, "Hey. [Counsel for appellee], you forgot an issue." He was specifically identified as a fact witness, and a witness to testify on causation, the evolution of decubitus ulcer....

THE COURT: [to counsel for appellee] Well, what is the area that you contend that we'll [sic] be explored that was not dealt with in deposition?

---

11. It is clear, under Maryland Rule 2–433(a)–(b), that the trial court may, when one of the parties violates an order compelling discovery, "prohibit that party from introducing designated matters in evidence." Md.Rule 2–433(a)(2) ... It is especially crucial for the trial court to exclude such evidence "on the eve of trial ... [where] 'the injury inherent in failure to make discovery is unfair surprise.'" *Beck v. Beck*, 112 Md.App. 197, 209, 684 A.2d 878 (1996), *cert. denied*, 344 Md. 717, 690 A.2d 523, 345 Md. 456, 693 A.2d 354 (1997) (citing *Bartholomee v. Casey*, 103 Md.App. 34, 48, 651 A.2d 908 (1994), *cert. denied*, 338 Md. 557, 659 A.2d 1293 (1995)) (in turn citing John A. Lynch, Jr. & Richard W. Bourne, *Modern Maryland Civil Procedure*, § 7.8(c), at 597 (1993)).

[COUNSEL FOR APPELLEE:] I don't know. Your Honor, that is my problem. I have no idea what it is except [counsel for appellants] has hinted very broadly that there will be additional different testimony other than that covered at deposition. . . .

THE COURT: [to counsel for appellants] Is there anything that he [Dr. Orlando] is going to talk about or try to talk about that he didn't talk about in the deposition?

[COUNSEL FOR APPELLANTS:] In a generic sense, he talked about it all in his deposition. He will expand—

THE COURT: Well, in a specific sense, can you tell me the difference?

[COUNSEL FOR APPELLANTS:] Well, I'll tell you what he'll say if that helps the Court and [counsel for appellee].

THE COURT: I'd like to know.

[COUNSEL FOR APPELLANTS:] Okay. And that's what I'll do. He's going to come in here. He's going to tell exactly what happened to Kevin Wilson during that admission. He's going to testify as to what he saw and what he did. He'll testify to what calls he made to get additional assistance for him. He's [sic] testify as to the evolution of a decubitus ulcer, how it goes from start to finish. He'll testify that there were two ulcers on this gentleman's low back, which is exactly what he said in his deposition. He'll testify that the sacral ulcer was not infected. He'll testify that they did not communicate with one another, and he'll tell the jury why. He will testify that, in his opinion, the sacral ulcer was older than the lumbar ulcer. He will testify how the lumbar ulcer got to be there in the first place.

THE COURT: Were all these areas covered in the deposition?

[COUNSEL FOR APPELLEE:] Yes, Your Honor.

THE COURT: Well, let's see what happens then instead of trying to go through this, and I'll deal with it accordingly.

During Dr. Orlando's direct examination, the following transpired when he used the word "broken" for the first time:

[COUNSEL FOR APPELLANTS:] Doctor, please, if you will, what I'd like you to do is express an opinion to a reasonable degree of medical probability as to what happened to Mr. Wilson....

[DR. ORLANDO:] ... his wheelchair was broken when I saw it on the 16 th. There was no—

[COUNSEL FOR APPELLEE:] Objection, Your Honor.

Judge Noel ultimately ruled as follows:

"There will be no further testimony in this case whatsoever that the chair was broken....[To Dr. Orlando:] You are not to make another reference or comment to the effect that the chair was broken. You may comment that the bar rubbed his back causing the lumbar ulcer. But you cannot say under any circumstances that the chair was broke."

Judge Noel subsequently engaged in the following conversation with appellants' counsel regarding the "broken" wheelchair theory:

THE COURT: Did you know that Dr. Orlando was going to offer testimony yesterday that the wheelchair was broken?

[COUNSEL FOR APPELLANTS]: Did I know that the wheelchair was—

THE COURT: Yes.... Did you know yesterday [the date of the first bench conference quoted above] that Dr. Orlando was going to offer testimony that the wheelchair was broken?

[COUNSEL FOR APPELLANTS]: Yes, I did.

THE COURT: When I asked you yesterday [at the first bench conference] to disclose to me if there was anything that he would testify to beyond that which was covered in the deposition, why didn't you advise me of that then?

[COUNSEL FOR APPELLANTS]: Because from my perspective, in reading his deposition, he did tell them that the wheelchair was broken. From my perspective, in reading the medical records, that information is readily available in the medical records. As a matter of fact, I recall [appellee's counsel] asking a question of one of the experts as to

whether it's important to look at the environmental factors such as whether or not there's a problem with the wheelchair. I, in a million years, did not suspect that they did not know that fact. The man testified in his deposition that he was astounded. When he testified in his deposition, he explained to [appellee's counsel] that the rod was rubbing into his back. That's the point, that's the only point that I wanted to make with that issue, not that he was somehow contributorily negligent.

THE COURT: My question again to you is did you know that he was going to say the wheelchair is broken, not that the rod was protruding into his back, but that the wheelchair was broken?

[COUNSEL FOR APPELLANTS]: To me, that's one in the same.

THE COURT: Did you know when I asked you if he was going to offer any testimony beyond that which was in the deposition, did you know then that he was going to offer testimony that the wheelchair was broken?

[COUNSEL FOR APPELLANTS]: Yes. And that was the same testimony from my perspective that had been elicited during his deposition. If [appellee's counsel] did not understand that concept when Dr. Orlando explained that the rod was going into his back, I'm sorry. I didn't think in a million years that I needed to articulate that any better than Dr. Orlando did. I understood that.

THE COURT: I have listened to every portion of that deposition, I believe, that there was a statement relative to that wheelchair. And from my perspective, to say that there was a problem with the rod on the back of the wheelchair rubbing against his back does not connote that the wheelchair was broken. I don't think that the average person would interpret the problem with the wheelchair was that there was a rod rubbing into his back to mean that it was broken. I think that that is a completely different topic, and I am most concerned about it.

You know the integrity of this process is extremely important to me . . .

[Appellants' counsel], it seems to me that there could have been more candor to the Court in your disclosure when I asked the question. Because saying that there was a problem with the rod or that the rod rubbed against his back does not connote to me that something is broken. There may be many situations that would affect a person in a particular way, but it doesn't say that something is broken. I think that's really stretching the situation.

██ When the question is whether there is a material variance between what the witness testified to at deposition and what the witness will testify to at trial, the trial judge's finding of fact will be affirmed on appeal unless the reviewing court is persuaded that the trial judge's finding is clearly erroneous. We are not persuaded that Judge Noel was clearly erroneous in finding that Dr. Orlando's deposition testimony about the condition of appellee's wheelchair "does not connote that the wheelchair was broken." When the question is whether the trial court selected an appropriate remedy for the type of discovery violation found in this case,[12] the trial court's remedy of choice will be affirmed on appeal unless the reviewing court is persuaded that the trial court abused its discretion. *Colter v. State*, 297 Md. 423, 426, 466 A.2d 1286 (1983). "Our review of the trial court's resolution of a discovery dispute is quite narrow; appellate courts are reluctant to second-guess the decision of a trial judge to impose sanctions for a failure of discovery. Accordingly, we may not reverse unless we find an abuse of discretion." *Klupt v. Krongard*, 126 Md.App. 179, 193, 728 A.2d 727, *cert. denied*, 355 Md. 612, 735 A.2d 1107 (1999).

---

**12.** As we have stated, even though appellant had not moved for a pretrial "order compelling discovery," the "unfair surprise" issue was raised at a bench conference that took place before Dr. Orlando testified. Thus, Judge Noel's restriction on Dr. Orlando's testimony involved the trial judge's broad exercise of discretion to prohibit trial by ambush.

Having applied the abuse of discretion standard to the ruling at issue, we are persuaded that Judge Noel made a "reasoned decision based on the weighing of various alternatives." *Judge v. R and T Construction Co.*, 68 Md.App. 57, 60, 509 A.2d 1236 (1986), *cert. denied,* 307 Md. 433, 514 A.2d 1211 (1986). This is simply not a case in which "no reasonable person would take the view adopted by the trial court." *North v. North,* 102 Md.App. 1, 13, 648 A.2d 1025 (1994). According to the Court of Appeals, for a discretionary ruling to be reversed,

> [t]he decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.

*In Re Adoption/Guardianship No. 3598,* 347 Md. 295, 313, 701 A.2d 110 (1997) (*quoting North, supra,* 102 Md.App. at 14, 648 A.2d 1025). *See also Metheny v. State,* 359 Md. 576, 604, 755 A.2d 1088 (2000).

In this case, appellants were entitled to—and did—assert that a bar on the back of appellee's wheelchair was the cause of a "second ulcer" that developed after appellee had been examined by Dr. Hill.[13] Appellants' expert witness was not prohibited from testifying at trial to everything that he had testified to in his deposition.[14] We are persuaded that

---

**13.** The closing argument of appellants' counsel included the following comments:

"And then thereafter, I don't know if it was going home from the hospital or going to and from school—[appellee's] wheelchair bar began to rub against his back in an area that normally doesn't get pressure sores. Remember this area up in here that Dr. Orlando explained is quite protected by the iliac crest? And the bar rubbed into his back and caused a second ulcer."

**14.** There is a price to pay for "tacking too close to the wind." *Ware v. State,* 348 Md. 19, 36, 702 A.2d 699 (1997). If appellants' counsel had proffered Dr. Orlando's "broken" wheelchair opinion at the time when Judge Noel requested a "specific" proffer of "anything that [Dr. Orlando] is going ... to try to talk about [during his testimony] that he didn't talk about in [his] deposition," Judge Noel might not have prohibited Dr. Orlando from opining that appellee's wheelchair was "broken."

appellants were not unfairly prejudiced by the ruling that prohibited Dr. Orlando from using a term that he had not used during his deposition.

## III. Contributory Negligence

■ Appellants also assert that the trial court erred in failing to grant their motions for (1) summary judgment, (2) new trial, and (3) judgment notwithstanding the verdict, because appellee was contributorily negligent. Appellants contend that appellee was contributorily negligent "as a matter of law." According to appellants, appellee "recognized that his condition had gotten dramatically worse and failed to return for further medical care despite his training and despite being given explicit instructions to return if his condition did get worse." They were entitled to—and did—present that argument to the jury, but we agree with Judge Noel that appellants were not entitled to judgment as a matter of law.[15]

---

For example, he might have decided to "give [appellee] ample time to investigate the matter and prepare for cross-examination." *ACandS v. Abate*, 121 Md.App. 590, 691, 710 A.2d 944 (1998), *cert. denied*, 350 Md. 487, 713 A.2d 979 (1998). By choosing to make a "generic" proffer, however, appellants' counsel ran the risk that Dr. Orlando's direct examination would be restricted to his deposition testimony.

We accept the representation of appellants' counsel that her decision to make a "generic" proffer was based upon a good faith belief that she had already complied with her discovery obligations. Counsel's state of mind, however, is not of dispositive consequence to the trial judge's choice of remedies for a discovery violation. "The power of the trial court to impose sanctions [for discovery abuses] is not limited by the requirement that they find willful or contumacious behavior." *Beck*, 112 Md.App. at 210, 684 A.2d 878 (citing *Lakewood Eng'g & Mfg. Co. v. Quinn*, 91 Md.App. 375, 383, 604 A.2d 535, *cert. denied*, 327 Md. 524, 610 A.2d 797 (1992)).

15. Summary Judgment is appropriate when there is no dispute as to any material fact and the party is entitled to judgment as a matter of law. Md.Rule 2–501. The standard of appellate review "is whether the trial court was legally correct." *Saponari v. CSX Transp.*, Inc., 126 Md.App. 25, 37, 727 A.2d 396, *cert. denied*, 353 Md. 473, 727 A.2d 382 (1999) (internal citations omitted). On review, "an appellate court determines whether there was sufficient evidence to create a jury question." *Id.*

492

 "Ordinarily, the question of whether a plaintiff was contributorily negligence or assumed the risk is one for the fact finder, not the court." *Campbell v. Montgomery County Bd. of Educ.*, 73 Md.App. 54, 64, 533 A.2d 9 (1987), *cert. denied,* 311 Md. 719, 537 A.2d 273 (1988). The issue of contributory negligence is generally "for the jury as long as there is a conflict of evidence as to material facts relied on to establish contributory negligence, or more than one inference may be reasonably drawn therefrom." *Id.* In order for appellee to be contributorily negligent as a matter of law

the evidence must show some prominent and decisive act which directly contributed to the accident and which was of such a character as to leave no room for difference of opinion thereon by reasonable minds.

*Id.* (Citing *Baltimore Gas & Electric Co. v. Flippo,* 348 Md. 680, 703, 705 A.2d 1144 (1998); *Reiser v. Abramson,* 264 Md. 372, 378, 286 A.2d 91 (1972)).

 Maryland "has adopted a very restrictive rule about taking cases from the jury in negligence actions." *Campbell v. Montgomery County Bd. of Educ.*, 73 Md.App. 54, 62, 533 A.2d 9 (1987). In fact, Maryland case law suggests that submission to the jury was proper "if there be any evidence, however slight, *legally sufficient* as tending to prove negligence, and the weight and value of such evidence will be left to the jury." *Id.* at 62–63, 533 A.2d 9. Moreover, we must "give due consideration not only to all inferences of fact tending to support the opposite view, but also to the important presumption that [the plaintiff] exercised ordinary care for [his] safety." *Saponari v. CSX Transportation,* 126 Md.App. 25, 37–38, 727 A.2d 396 (1999) (citing *Pachmayr v. Baltimore & Ohio R.R. Co.,* 157 Md. 256, 262, 145 A. 611 (1929)). This Court has also stated that "... even if the act done [by the plaintiff as claimed as his contributory negligent action] turns out to be an error of judgment, this alone does not make the act negligent if an ordinarily prudent person may have made the same error." *Faith v. Keefer,* 127 Md.App. 706, 747, 736 A.2d 422, *cert. denied,* 357 Md. 191, 742 A.2d 521 (1999) (citing *Sanders v. Williams,* 209 Md. 149, 120 A.2d 397 (1956)).

In support of their contention that appellee's failure to go back to the hospital or seek medical attention during the two week period between when Dr. Hill saw him and his admittance to the hospital was something that "a person of ordinary prudence would [not] do under the circumstances," appellants rely upon cases that are readily distinguishable on their facts. For example, in *Chudson v. Ratra*, 76 Md.App. 753, 548 A.2d 172, *cert. denied,* 314 Md. 628, 552 A.2d 894 (1989), the plaintiff was also told by her doctor to see him again if her condition got worse, and she noticed changes in her medical condition between the time of her appointment with her doctor and when she ultimately sought treatment. The lapse of time in that case, however, was over one year rather than two weeks. In the present case, appellee's failure to go to the hospital one week before his next scheduled appointment does not establish that he was contributorily negligent as a matter of law. Reasonable minds could differ on the level of understanding of the instructions given to appellee by Dr. Hill as well as on the time frame of his worsened condition.

Moreover, there are other material facts in serious dispute. Appellants claim that appellee had several different ulcers on his back, and that he contributed to his own condition by waiting a week to seek medical care. On the other hand, appellee asserts that his infection was caused by the one ulcer he had as of his first visit, and that his legs would not have been amputated if Dr. Hill had not breached the standard of care. Giving due consideration to the facts tending to "support the opposite view," we are persuaded that appellee was not contributorily negligent as a "matter of law." Thus, Judge Noel's decision to deny summary judgment was "legally correct."

Similarly, Judge Noel did not err in denying appellants' Motions for Judgment and Judgment Notwithstanding the Verdict. A motion for judgment notwithstanding the verdict "tests the legal sufficiency of the evidence and is reviewed under the same standard as a motion for judgment made during trial." *Nationwide Mut. Fire Ins. Co. v. Tufts*, 118 Md.App. 180, 190, 702 A.2d 422 (1997), *cert. denied,* 349 Md.

104, 707 A.2d 89 (1998) (citing *Houston v. Safeway Stores, Inc.*, 109 Md.App. 177, 182–3, 674 A.2d 87 (1996), *rev'd on other grounds*, 346 Md. 503, 697 A.2d 851 (1997)). Therefore, the appropriate standard of review is: "If there exists any legally competent evidence, however slight, from which the jury could have found as it did, we must affirm the trial court's denial of the motion." *Id.* at 191, 674 A.2d 87 (internal citations omitted). On review, we are to "assume the truth of all credible evidence and all inferences of fact reasonably deductible from the evidence supporting the party opposing the motion." *Id.* at 190, 674 A.2d 87. We hold that there was "legally competent evidence from which the jury could have found as it did." Assuming the truth of the evidence from the position of appellee, there was "sufficient evidence for the jury to conclude as it did."

We are also persuaded that Judge Noel did not err or abuse his discretion in denying appellants' Motion for a New Trial. "The question whether to grant a new trial is within the discretion of the trial court." *Aron v. Brock*, 118 Md.App. 475, 511, 703 A.2d 208, *cert. denied*, 346 Md. 629, 697 A.2d 913 (1997) (citing *Buck v. Cam's Broadloom Rugs, Inc.*, 328 Md. 51, 612 A.2d 1294 (1992)(internal citations omitted)). The nature of Judge Noel's discretion on whether to grant appellants' motion was "the broadest range" of discretion:

> The emphasis has consistently been upon granting the broadest range of discretion ... whenever the decision ... depended upon ... evaluation of the character of the testimony and of the trial when the judge is considering the core question of whether justice has been done.

*Id.* Judge Noel was the presiding judge at the trial, had the opportunity to evaluate both the credibility of the witnesses and the evidence, and was thus in the best position to decide whether "justice had been done."

## IV. Jury Instructions

Appellants contend that Judge Noel erred by giving an incomplete jury instruction involving appellee's reliance on statements made by Dr. Hill. Appellee requested a specif-

ic jury instruction based on this Court's decision in *Simmons v. Urquhart,* 106 Md.App. 77, 664 A.2d 27 (1995). Judge Noel delivered the following instruction:

Now, in general, patients are entitled to rely on their physician's advice. That reliance must be reasonable and justified. A patient is not in a position to diagnose his own ailments. As a consequence, it is not contributory negligence for a patient to follow a doctor's instructions or rely on the doctor's advice, to fail to consult another doctor, or to fail to diagnose his own illness.

Appellants objected to that instruction on the basis that it was incomplete in light of *Simmons.* Appellants' counsel stated:

... I didn't think it was complete. The case that she [appellee's counsel] cites as the support for it actually had the words, "the reliance must be reasonable and justifiable in order for patients to satisfy their own obligations to exercise reasonable care in safeguarding their own health and safety." And I would ask that that language be added.

Judge Noel noted and overruled that exception.

In *DiLeo v. Nugent,* 88 Md.App. 59, 592 A.2d 1126, *cert. granted,* 325 Md. 18, 599 A.2d 90 (1991), *appeal dismissed,* 327 Md. 627, 612 A.2d 257 (1992), the appellant contended that the trial court had erred in instructing the jury that

it is not contributory negligence for a patient to follow a doctor's instructions or rely on his advice when that patient has no reason to suspect the doctor's treatment or advice is the cause of the patient's injury.

*DiLeo,* 88 Md.App. at 73, 592 A.2d 1126. This contention was rejected on the ground that "the instruction conforms precisely with Maryland law." *Id.* Specifically, the *DiLeo* Court held:

[W]e have recognized in the past that a patient is not in a position to diagnose her own ailments, appreciate the risks of medication or evaluate whether the prescribed course of treatment is in her best interest. As a consequence, it is not contributory negligence for a patient to follow a doctor's instructions or rely on the doctor's advice, to fail to consult

another doctor when the patient has no reason to believe that the doctor's negligence has caused her injury, or to fail to diagnose her own illness.

*Id.* (Citing *Santoni v. Moodie,* 53 Md.App. 129, 138, 452 A.2d 1223 (1982), *cert. denied,* 295 Md. 527 (1983)).

In reviewing the adequacy of a specific jury instruction, we are required to ascertain whether the instruction "fairly and accurately set forth the law applicable to the case [and was] supported by testimony or evidence presented during the case." *Odenton Development Co. v. Lamy,* 320 Md. 33, 43, 575 A.2d 1235 (1990). Maryland law provides that "a litigant is entitled to have his or her theory of the case presented to the jury if that theory is a correct exposition of the law and if there is evidence in the case which supports that theory." *Zeller v. Greater Baltimore Medical Center,* 67 Md.App. 75, 80, 506 A.2d 646 (1986). The instruction given by Judge Noel also conformed with Maryland law. In reviewing whether Judge Noel was correct in denying appellants' requested instruction, we must conduct a three part inquiry:

first, whether the requested instruction is a correct statement of the law, second, whether the law is applicable to the facts in the case, and third, whether the trial judge fairly covered with the same law by other instructions actually given.

*Fearnow v. The Chesapeake & Potomac Telephone Company of Maryland,* 342 Md. 363, 385, 676 A.2d 65 (1996) (internal citations omitted). "If any one part of the test is not met, we will affirm the trial court's denial of the request for instruction." *Id.*

Maryland Rule 2–520(c) governs the manner in which jury instructions are to be given and provides:

The court may instruct the jury, orally or in writing or both, by granting requested instructions, by giving instructions of its own, or by combining any of these methods. The court need not grant a certain instruction if the matter is fairly covered by instructions already given.

Md.Rule 2–520(c). Judge Noel's instruction used the identical language that was sufficient in *DiLeo,* while adding the *Simmons* requirement "that [the patient's] reliance must be reasonable and justified." Therefore, the instruction at issue was a "correct statement of the law." Moreover, because appellants' trial counsel "could, and did, present the very arguments to the jury that [she] would have made had [the requested] instructions been given, the matter was fairly, and adequately, covered in the instructions actually given." *CSX Transportation, Inc. v. Continental Ins. Co.,* 343 Md. 216, 243, 680 A.2d 1082 (1996).

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.**

Dissenting Opinion by HOLLANDER, J.

HOLLANDER, Judge, dissenting.

I respectfully dissent from the majority opinion regarding Issue II. There, the Court upholds the trial judge's ruling that precluded appellants from offering evidence to establish that, at the relevant time, appellee's wheelchair was "broken" and caused an ulcer on the lumbar area of appellee's back.

At trial, the parties disputed the location and condition of the ulcer on appellee's back when he went to the emergency room at Good Samaritan Hospital on August 30, 1994. They also disagreed about the number, location, and condition of the ulcers on Mr. Wilson's back when he returned to the hospital on September 14, 1994.

Mr. Wilson contended that, on August 30, 1994, when he was treated by Dr. Hill at the emergency room, he had an infected ulcer on his back, but Dr. Hill misdiagnosed him as suffering from a urinary tract infection. Two weeks later, on September 14, 1994, Mr. Wilson was admitted to the hospital because his condition had worsened. Dr. Joseph Orlando, who had treated Mr. Wilson in the past, examined appellee on September 16, 1994, and was offered by the defense as both a fact witness and as an expert.

Appellants maintained that Dr. Hill correctly diagnosed the urinary tract infection on August 30, 1994. They also sought to establish that the ulcer on appellee's back on that date was located in the sacral area, and that after August 30, 1994, appellee developed a second ulcer in the lumbar area of his back. According to appellants, it was the lumbar ulcer that became infected and ultimately led to the amputations. Additionally, the defense sought to show that the lumbar ulcer was caused by appellee's wheelchair, which allegedly had a metal rod protruding from the back that penetrated Mr. Wilson's lumbar area, enabling bacteria to invade his body.[1]

In analyzing Issue II, it is important to review the facts that culminated in the trial court's ruling.

## FACTUAL SUMMARY

Appellants disclosed in answers to interrogatories that they intended to call Dr. Orlando as both a fact witness and an expert witness as to causation. To be sure, appellants' disclosure did not reveal Dr. Orlando's position that the lumbar ulcer was caused by appellee's defective wheelchair. Based on the content of the interrogatory answer, however, appellee noted Dr. Orlando's deposition.

At his deposition, Dr. Orlando stated that appellee had an infected lumbar ulcer when he examined him on September 16, 1994. Moreover, he opined that the lumbar ulcer was caused by the transverse bar located on the back of appellee's wheelchair. As footnote 3 of the majority opinion reveals, appellee's counsel did not pose any follow-up questions to Dr. Orlando concerning the condition of the wheelchair, even after Dr. Orlando "invite[d]" appellee's counsel to look at the wheelchair, stated that he was "astounded" when he saw its condition, and claimed that Mr. Wilson "rode" the metal bar on the back of the wheelchair "right into his back...."

---

1. Above-the-knee amputations were required as a consequence of the severe infection surrounding the ulcer, as it occluded the blood supply to appellee's lower extremities.

At trial, appellee's counsel expressed concern to the court that Dr. Orlando's trial testimony might be "somewhat different and more expansive than the testimony he offered under oath at deposition," based on a "hint" she received from the defense lawyer.[2] Appellee's attorney also argued that any deviation in testimony would violate "fundamental rules of fairness as well as the rules of discovery...." In response, the court asked appellee's counsel about the "area" that she thought might be "explored that was not dealt with in deposition." Appellee's attorney replied: "I don't know. Your Honor, that is my problem. I have no idea what it is except [defense counsel] has hinted very broadly that there will be additional different testimony other than that covered at deposition."

Based on defense counsel's response to questions posed by the court, the judge initially did not restrict the testimony of Dr. Orlando. When appellants' counsel posed her questions to Dr. Orlando during his direct examination, he responded on several occasions by describing appellee's wheelchair as "broken." Appellee's attorney did not immediately object to the questions that prompted those responses, nor did appellee's counsel move to strike the answers. Because of my view of the importance of the early testimony of Dr. Orlando, which came into evidence without objection, it is set forth below:

[COUNSEL FOR APPELLANTS]: Okay. I want you to tell the jury, if you will, what caused that upper [lumbar] ulcer. What caused this ulcer at this level that you've never seen in your 25 years of practice?

[DR. ORLANDO]: Well, not only had I never seen it, but I don't think anybody on the chart had ever seen an ulcer in that area. And when I first saw [appellee] on the afternoon of September the 16th, 1994, and I examined this area, and examined [appellee], and examined his feet, and made note

---

2. The attorney who conducted the deposition for appellee was not the attorney who expressed concern to the court about Dr. Orlando's anticipated testimony or who made the various arguments to the court about the trial testimony.

of those ulcers, I was perplexed. I could not understand why he had a lumbar ulcer. . . .

His wheelchair was by the side of his bed, and I turned around, and I looked at his wheelchair. And I was literally astounded. I mean, I really was. And I said to [appellee], "Kevin, have you been sitting in this wheelchair? This is the reason why you've got this ulcer back here." I even said to him, "I've never seen anything in the lumbar area like this. How'd you get"—

[COUNSEL FOR APPELLANTS]: What did you see in Mr. Wilson's wheelchair?

[DR. ORLANDO]: *The back of his wheelchair was broken back.* He had a sports wheelchair. It has a lumbar support. When you're in—if you ever sit in a bucket seat in a car, it has a support. It helps to support your lumbar area. *And it presses against your lumbar area.*

*The back of his wheelchair was broken. The lumbar support, which I think was one bar, was now broken in the middle. And the stainless steel bar, which was about the size of a—a little bigger than a pencil, but maybe not quite as big as my little finger—was squished forward about an inch to maybe even—well, let's say an inch, but it could have been more. And the astounding thing was the vinyl or leather that was over it was not even over it. It had pushed right through the vinyl.*

*So he had been in that wheelchair for seven days, or ten days, or so, and it was broken. And it had been pushing— that bar had been pushing right here over that period of time. . . .*

E.1238–1240 (Emphasis added).

\* \* \*

[COUNSEL FOR APPELLANTS]: So the sacral ulcer was not infected. What ulcer was infected?

[DR. ORLANDO]: The first ulcer, the lumbar ulcer.

[COUNSEL FOR APPELLANTS]: The one up here? (Indicating.)

[DR. ORLANDO]: Yes.

[COUNSEL FOR APPELLANTS]: That was caused by the wheelchair?

[DR. ORLANDO]: A little bit lower. Right there.

[COUNSEL FOR APPELLANTS]: *The one caused by the wheelchair?*

[DR. ORLANDO]: Right. You have to remember though that iliac crest is protecting everything below that so when that bar was coming in, it had to come above the iliac crest. You're still a little bit too high. Just take a pencil and point—

[COUNSEL FOR APPELLANTS]: Why don't you show them. I'm not an—

THE COURT: Doctor, describe for the record where you're pointing exactly.

(The witness approached Defense Exhibit Number 9.)

[DR. ORLANDO]: Yes. As I mentioned before, the iliac crest protects the top part of the sacrum. And also there's a fair amount of tissue in this area. That helps to protect the lumbar area. *So you need something sharp to get through here, and his [wheelchair] bar on his right side had come across here, and it was above the level of the ilium, and it was pressing right here.* (Indicating.) It was right about at this level here.

E.1252–1253 (Emphasis added).

\* \* \*

[DR. ORLANDO]: On the 30th of August, Mr. Wilson developed a pressure ulcer in this area from sitting in his wheelchair which is the prominent area in which sacral ulcers develop. When you're lying in bed for a long time, the ulcers tend to develop more in this area. This is a low sacral ulcer. And it also involves the coccyx, which is this small bone down here. It's called a sacral ulcer.

[COUNSEL FOR APPELLANTS]: Let me stop you just for a second because I'm not sure that the jury can appreciate what the different body parts are.

E.1262.

\* \* \*

[COUNSEL FOR APPELLANTS]: Doctor, please, if you will, what I'd like you to do is to express an opinion to a reasonable degree of medical probability as to what happened to Mr. Wilson.

[DR. ORLANDO]: That's what I'm doing.

[COUNSEL FOR APPELLANTS]: I know. Go ahead.

[DR. ORLANDO]: Well, we know [the sacral ulcer] wasn't infected because [appellee] said—Mr. Wilson said—there was no blood on the dressing. He also said that there was no foul odor. So those are two things that indicate to me that it wasn't a deep ulcer, and that it wasn't infected.

We also know that he came there because he had cloudy urine for one week's duration, which is one of the Hallmark's [sic] of a urinary tract infection, especially if it changed from the week before to that. So he was treated for a urinary tract infection, and he was sent home.

Somewhere subsequent to that, and according to Kevin's deposition—

[COUNSEL FOR APPELLANT]: Mr. Wilson.

[DR. ORLANDO]: I'm sorry. According to Mr. Wilson's deposition, and *somewhere subsequent to that*—strike what I said about subsequent—*his wheelchair was broken when I saw it on the 16th [of September].* There was no—

[COUNSEL FOR APPELLEE]: Objection, Your Honor.

THE COURT: I'm going to sustain the objection.

E.1264–1265 (Emphasis added).

When counsel for appellee finally objected, she complained at the bench only about the factual basis for Dr. Orlando's suggestion that appellee's wheelchair broke sometime between appellee's two hospital visits. She argued that Dr. Orlando

was "factually ... suggesting that Mr. Wilson's wheelchair was broken sometime between the 30th of August and the 14th of September. There has been no evidence of that." Thus, although appellee's attorney challenged the basis for Dr. Orlando's knowledge as to when the wheelchair became broken, she did not dispute his assertion that the wheelchair was, in fact, broken.

Thereafter, the court raised, *sua sponte*, the issue of the broken wheelchair, stating: "I'm concerned about where you would like to go with this issue of this broken wheelchair." Only then did counsel for appellee assert that she had "never heard about a broken wheelchair before [Dr. Orlando] took this witness stand.... He didn't mention it at anytime under oath in his deposition. The first time I heard about it was here today." The matter was discussed on several occasions during the trial, and appellee's counsel later complained that she had been "sandbagged" because the defense "injected" a new issue in the case.

In its discussions with the attorneys, the court inquired: "Does the record indicate anything about the wheelchair being broken, or does the record indicate that his back was *rubbing* against a certain place in the wheelchair?" Appellee's counsel informed the court that there was "no reference anywhere in the medical records to the wheelchair being broken," and that Dr. Orlando did not so state at his deposition. Appellants' attorney asserted that the medical records disclosed the defective condition of the wheelchair. She pointed to Dr. Orlando's note in the medical records on September 16, 1994, as follows: "Extensive posterior lower trunk ulcer secondary to pressure from bar when sitting." Further, on September 16, 1994, a "rehab" doctor wrote a note in the medical records, indicating that appellee had an ulcer caused by "problems secondary to undue pressure from the wheelchair frame." In the court's view, however, the reference to "secondary to the bar" was not the equivalent of stating that the wheelchair was broken.

Moreover, the court stated that testimony at the deposition about pressure to appellee's back caused by a bar on the back

of his wheelchair was not the same as testimony about a broken wheelchair. Rather, the court viewed the doctor's reference to the bar at his deposition as "quite different" from any representation that the wheelchair was "broken," and said it was not "fair warning whatsoever that the chair was broken." Further, the court said that whether the wheelchair was broken constituted "a completely new element in this case that [is] rather critical." The court reasoned: "If he testified that he saw the wheelchair in a condition that was not the appropriate condition, is one issue. But to testify that it was broken and the plaintiff used a broken wheelchair for an extended period of time, is altogether different."

The defense attorney disagreed, claiming that, "from [her] perspective, in reading [Dr. Orlando's] deposition, he did tell them that the wheelchair was broken." She pointed to various portions of Dr. Orlando's deposition testimony, consistent with the content of footnote 3 of the majority opinion. Appellants' lawyer also maintained that it was not her "job" at the deposition to ask follow-up questions. Although the court expressly declined to determine "[w]hose job it was to pursue [the issue] during the deposition," the judge stated that he was "absolutely surprised" and "actually shocked" that "neither side bothered to ask" additional questions to explore what it was about the bar or its condition that caused the lumbar ulcer. In addition, the court said: "Counsel, it's easy to sit here after everything is said and done and second guess. But with the legal power in this courtroom, and for him to say that the bar caused the ulcer, I'm shocked that nobody said, 'How?' or 'Why?' " Later, the court said:

> And how this could not have been gone into on the deposition really surprises me. Once the doctor said in two locations in the deposition that the lumbar ulcer was caused because of the bar riding against Mr. Wilson's back in the same position.
>
> It would have seemed that both sides would have pursued this area a little further by asking how or why did it do this. . . . And the plaintiff would have wanted to know why in preparation for their case.

Moreover, the court reiterated: "When the doctor made several references to the bar, I'm actually shocked that neither side bothered to ask, 'what about the bar doing this? Why did the bar do it? Or how did the bar do it?' "

Additionally, appellants' counsel insisted that she was not attempting to establish that appellee was contributorily negligent in using the defective wheelchair. Instead, she claimed that the condition of the wheelchair was relevant to the issue of causation of the ulcer on the lumbar area of appellee's back.[3] Accordingly, appellants' counsel indicated to the court that she had no opposition to an instruction to the jury to the effect that Mr. Wilson's use of a broken wheelchair was not evidence of contributory negligence.

Out of the presence of the jury, the court also questioned Dr. Orlando about his testimony. The doctor advised the court that he thought he had testified at his deposition that the wheelchair was broken. The following colloquy is relevant:

> THE COURT: You've never offered this opinion that the wheelchair was broken either in your deposition or in any of your discussions; is that correct?

> [DR. ORLANDO]: Well, no, I did, sir. It's in my deposition. As a matter of fact, I think in my exact words it says, "I was astounded when I looked at the wheelchair." And the word "astounded" is in my deposition. Because that's the reason Mr. Wilson got his lumbar ulcer. I was quite emphatic about that.

The court concluded that appellants' conduct contravened the purpose of discovery, stating:

> The purpose of discover[y] is so we do not have situations like we're having right now.

---

**3.** As noted, the defense maintained that the lumbar ulcer did not exist when Mr. Wilson was first seen at Good Samaritan Hospital on August 30, 1994, and it developed thereafter as a result of the condition of the wheelchair.

* * *

So on one hand, to say that the wheelchair caused the problem is one thing. To say that Mr. Wilson, who has knowledge about this condition, knowingly sat in a broken wheelchair is a completely different situation.... Because it is a very critical issue in [appellee's] case that [appellee's counsel] was not apprised of in discovery.

To say that something is secondary and something results from pressure is quite different from saying someone sat in a broken wheelchair knowingly and let this happen. It's quite different.

Ultimately, the court ruled: "There will be no further testimony in this case whatsoever that the chair was broken." In precluding appellants from offering evidence that the wheelchair was broken, the court found that the defense had not adequately disclosed that information at the deposition of Dr. Orlando. The court reasoned: "I don't see how anyone is going to be able to infer from this [deposition] testimony that the bar caused this problem. I have no idea how someone can infer that the chair was broken from that testimony."

Nevertheless, the judge instructed Dr. Orlando that he could "comment that the bar rubbed [appellee's] back causing the lumbar ulcer. But you cannot say under any circumstances that the chair was broken." Thereafter, in its instructions to the jury, the court said: "[Y]ou are instructed that there is no evidence in this case that Mr. Wilson's wheelchair was broken, and you are not to consider any evidence of this nature or that nature in your deliberations whatsoever."

## DISCUSSION

In the many colloquies that the trial court had with counsel concerning the wheelchair, it is clear that the trial court did not consider Dr. Orlando's description of the condition of the wheelchair at his deposition the equivalent of his claim at trial that the wheelchair was broken. The majority concludes that the trial judge "was not clearly erroneous in finding that Dr. Orlando's deposition testimony about the condition of appel-

lee's wheelchair 'does not connote that the wheelchair was broken.'" In my view, under the circumstances attendant here, the harsh sanction imposed by the court amounted to an abuse of discretion.

At his deposition, Dr. Orlando disclosed that he saw the wheelchair, and he provided his opinion that the wheelchair caused appellee's lumbar ulcer. It was also apparent from the doctor's testimony that he believed the wheelchair was defective, although he did not describe it as "broken." In light of the doctor's assertions, it was incumbent on appellee's counsel to explore, pursue, and develop the doctor's contentions. Yet, even after Dr. Orlando remarked that he was "astounded" when he "saw the wheelchair," and stated that Mr. Wilson "rode" the bar into his back, plaintiff's counsel never pursued the matter. Therefore, if his attorneys were not more fully aware of the defense position, it is not because they were "sandbagged." To the extent that appellee did not know specifically that appellants claimed the wheelchair was "broken," it is because appellee's attorney at the deposition never asked even one follow-up question to explore Dr. Orlando's many comments about the wheelchair. Thus, appellee's claim at trial of unfair surprise was unfounded.

A deposition "is the most powerful and complete means of discovery...." Paul V. Niemeyer & Linda M. Schuett, *Maryland Rules Commentary*, 270 (2d ed.1992) (hereinafter, "Niemeyer & Schuett"). Through a process of probing questions, an attorney who conducts a deposition is ordinarily able to "discover" information relevant to the case. Certainly, a deponent must respond accurately to questions that are asked, and not hide information responsive to a particular question. But, it falls squarely on the lawyer conducting the deposition to pose the proper questions to ascertain relevant information that may prove vital to the case, and to gain an understanding of an opponent's theory, contentions, and factual predicates. That did not happen here.

Although Dr. Orlando never used the word "broken" at his deposition, the witness's failure to use that word is not,

standing alone, fatal to the use of that word at trial, considering that neither deposition nor trial testimony of a witness is supposed to be scripted. What is important is whether the witness truthfully and accurately answered questions that were properly posed. There is no suggestion here that the witness willfully withheld information responsive to the lawyer's questions. Dr. Orlando disclosed adequate information about the condition of the wheelchair to have prompted appellee's attorney to inquire further. Yet, appellee's counsel never asked any questions about the wheelchair. Therefore, Dr. Orlando's characterization at trial of a "broken" wheelchair was not the kind of unfair deviation from his deposition testimony that warranted such a harsh sanction.

Appellee's reliance on *Bartholomee v. Casey,* 103 Md.App. 34, 651 A.2d 908 (1994), *cert. denied,* 338 Md. 557, 659 A.2d 1293 (1995), a lead paint case, is misplaced. Indeed, that case suggests to me that the court below abused its discretion. There, the plaintiffs' evidence at trial squarely contradicted their answers to interrogatories. As a result, we concluded, *inter alia,* that the court abused its discretion "by admitting evidence that did not conform to the plaintiffs' discovery responses." *Id.* at 45, 651 A.2d 908.

In *Bartholomee,* only four days before trial, in a case that had been pending for more than four years, the plaintiffs filed affidavits alleging for the first time that the property owner knew of peeling lead paint on the exterior of the property in issue, that the owner's attempted abatement was ineffective, and that the dangerous condition persisted even after the attempted abatement. Those averments conflicted with the plaintiffs' answers to interrogatories. In light of the belated disclosure, the defense unsuccessfully sought a postponement or, alternatively, a ruling barring evidence relating to the abatement efforts and the condition of the exterior of the house. *Id.* at 47, 651 A.2d 908.

On appeal, we recognized that "[a] trial court clearly has the power to exclude evidence *willfully* withheld by one party in violation of properly filed discovery requests." *Bartholomee,*

103 Md.App. at 48, 651 A.2d 908 (emphasis added); *see* Md. Rule 2–433(a); *Starfish Condominium Ass'n. v. Yorkridge Serv. Corp. Inc.*, 295 Md. 693, 712, 458 A.2d 805 (1983) (recognizing court's discretion to exclude testimony of expert witness who was not identified in response to interrogatory request, even if failure to disclose "was not willful or contumacious."). We also distinguished in *Bartholomee* a failure to supply information properly requested in an interrogatory, evident early in a case, which could be "easily remedied by an order compelling disclosure" under Md. Rule 2–432(b), from a belated disclosure on "the eve of trial." *Bartholomee*, 103 Md.App. at 48, 651 A.2d 908; *see State Roads Comm'n v. 370 Ltd. Partnership*, 325 Md. 96, 109, 599 A.2d 449 (1991) (upholding judge's discretion to bar expert testimony because expert was not disclosed in answers to interrogatories, no information as to expert's opinion was provided before trial, and proposed testimony was not based on what occurred in courtroom; witness could have formed opinion based on information available before trial and opponents were unfairly denied "meaningful pretrial discovery.").

As to the court's failure to exclude evidence regarding the exterior of the house, we found no error because the Health Department's notice had disclosed that the exterior paint contained lead and was flaking. *Bartholomee*, 103 Md.App. at 49, 651 A.2d 908. Nevertheless, we concluded that the trial court abused its discretion by admitting evidence concerning the abatement method and post-abatement condition of the property, in light of previous statements by the plaintiffs in discovery, which we characterized as "tantamount to a concession" that the abatement was satisfactory and that the defendant had fulfilled any duty owed to the plaintiffs. *Id.* at 50, 651 A.2d 908. We focused on the disputed evidence, which "flatly contradicted" the answers to interrogatories and constituted "the kind of unfair surprise that careful adherence to the discovery process was intended to avoid." *Id.*

This case is altogether different from *Bartholomee* and the other cases cited above. Here, there is no contention that appellants failed to make timely disclosure of their expert or

their claim that the lumbar ulcer was caused by the condition of the wheelchair. Nor did they ever "flatly contradict" at trial the position advanced at the deposition. The semantic difference in the deposition and trial testimony was, at worst, a difference of degree. Dr. Orlando clearly stated at his deposition that the condition of the wheelchair caused the lumbar ulcer. If appellee had explored that assertion, and the doctor then failed to expand on his testimony in such a way as to convey more clearly that the wheelchair was "broken," I might agree with the majority. That exploration never occurred, however. Therefore, what we said in *Bartholomee* should apply here: "'A party seeking discovery may not expect his opponent to construe discovery requests as broadly as possible, in essence, to volunteer information beyond the request, on pain of preclusion of evidence at trial as a discovery sanction.'" *Bartholomee*, 103 Md.App. at 49, 651 A.2d 908 (quoting John A. Lynch, Jr. & Richard W. Bourne, *Modern Maryland Civil Procedure*, § 7.8(c), at 597 (1993)).

Moreover, in my view, appellee waived his claim of error because of an untimely objection at trial. Notwithstanding the concern of appellee's counsel that Dr. Orlando's trial testimony might differ from what Dr. Orlando had said at his deposition, appellee's lawyer did not object to Dr. Orlando's testimony that the wheelchair was broken until after he had so testified on several occasions. Thus, the majority is plainly wrong in stating that, during Dr. Orlando's direct examination at trial, appellee's counsel objected the first time that the witness used the word "broken." Interestingly, if, as appellee argues, the testimony of Dr. Orlando regarding the broken condition of the wheelchair was such a surprise, and was materially different from that which had been offered by Dr. Orlando at the deposition, surely appellee's skilled and experienced attorney would have noticed and would have promptly objected.

Based on some of the responses of appellant's counsel to various questions posed by the court during the many discussions about the matter, the judge was understandably frustrated by what he perceived as defense counsel's lack of

candor and too much gamesmanship. I do not condone such conduct. Nevertheless, we should not lose sight of the totality of the situation. Appellee was placed on notice at Dr. Orlando's deposition of the defense contention that the wheelchair was defective, and that its condition caused a lumbar ulcer. At the deposition, appellee's attorney never pursued that contention by asking even a single follow-up question. Even after the deposition, I am not aware of any specific attempt by appellee to obtain clarification of the doctor's testimony. Moreover, appellee initially failed to object to the repeated testimony of Dr. Orlando at trial that the wheelchair was broken. For these reasons, I believe the court abused its discretion when it barred appellants from pursuing the defense theory that the lumbar ulcer developed after appellee was seen at the emergency room on August 30, 1994, and was caused by appellee's defective wheelchair.

Although the court indicated that it would permit Dr. Orlando to testify at trial as he had at his deposition, I cannot conclude that appellants were able adequately to present their defense. To reach that conclusion, I would have to overlook the court's instruction to the jury, admonishing it not to consider any evidence that the wheelchair was broken. The jury was not necessarily able to distinguish between a "broken" wheelchair and a transverse bar on the back of the wheelchair that rubbed appellee's back, especially if, as the defense argued, the deposition testimony was tantamount to an assertion that the wheelchair was broken. In effect, then, the jury was told to disregard the testimony as to the condition of the wheelchair, and appellants were put in an untenable position with respect to their defense.

Accordingly, I respectfully dissent.