49 A.3d 333

**Roger SCHNEIDER**

v.

**Victoria LITTLE.**

No. 1346, Sept. Term, 2010.

Court of Special Appeals of Maryland.

June 1, 2012.

Reconsideration Denied Sept. 4, 2012.

416

418

422

Ward B. Coe, III (Hillary H. Arnaoutakis, Gallagher, Evelius & Jones, LLP, on the brief), Baltimore, MD, for Appellant.

James D. Cardea (Jonathan Schochor, Scott P. Kurlander, on the brief), Baltimore, MD, for Appellee.

Panel: MATRICCIANI, BERGER, and JAMES R. EYLER (Retired, Specially Assigned), JJ.

BERGER, J.

This case arises out of the tragic paraplegia of Victoria Little ("Little") as a result of a surgical procedure that had various complications. Little brought suit for medical malpractice and a jury trial was held in the Circuit Court for Harford County. The jury returned a verdict in favor of Little against defendants Dr. Roger Schneider ("Schneider"), Dr. Mark Gonze ("Gonze"), and Vascular Surgery Associates, LLC, and judgment was entered for $2,874,398.00. The jury

returned a verdict in favor of defendants Dr. Michael Eves and Northern Chesapeake Anesthesia Associates. Schneider, Gonze, and Vascular Surgery Associates, LLC, filed a motion for a new trial, which the circuit court denied. This timely appeal followed.[1]

Schneider presents four issues for our review, which we have rephrased slightly as follows:

I. Whether the trial court erred by prohibiting the introduction into evidence of a 2007 CAT scan.

II. Whether the trial court erred by allowing the plaintiff to introduce evidence of defendant physician's lack of board certification.

III. Whether the trial court abused its discretion by permitting the plaintiff's expert, Thomas Dodds, M.D., to testify on the issue of causation.

IV. Whether the trial court erred in concluding that the plaintiff had met her burden of proving causation.

For the reasons set forth below, we find the trial court erred with respect to the CAT scan and board certification issues, and accordingly, we reverse the judgment of the Circuit Court for Harford County and remand for a new trial.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

On July 16, 2007, Victoria Little went to the hospital for aortobifemoral bypass surgery. The aorta is the largest artery in the body, and the purpose of aortobifemoral bypass surgery is to repair a blocked aorta. The surgery is performed on the abdominal aorta below the renal arteries by using a graft to connect the aorta to the femoral artery, thereby bypassing the blocked portion of the aorta. The place where the graft and the artery are connected is referred to as

---

1. After trial, Gonze and Vascular Surgery Associates decided not to pursue an appeal and entered into a settlement with Little, leaving only Schneider continuing this appeal.

2. We decline to reach the issue of plaintiff's burden of proving causation as our opinion renders it moot.

an anastomosis, and an anastomosis can be performed end-to-end or end-to-side.[3] Here, the surgeons, Schneider and Gonze, had discussed whether to perform an end-to-end or end-to-side anastomosis and determined that it was appropriate to perform an end-to-end bypass because it is generally the preferred method.[4] A surgeon determines the appropriate size graft based upon visual inspection when the aorta is exposed by comparing the size of the aorta to the size of the graft he intends to use.

During an aortobifemoral bypass, a clamp is placed on the aorta below the renal arteries. Thereafter, the aorta is cut and an endarterectomy, a surgical procedure by which plaque is removed from the wall of an artery that has become narrowed or blocked, is performed. The surgeon then selects an appropriately sized graft and sutures it to the aorta.

During the surgery, Schneider and Gonze selected a 16 × 8 mm graft as the appropriate size for the aortobifemoral bypass. Schneider and Gonze were unable to complete the aortobifemoral bypass as originally planned and converted to an axillobifemoral bypass. Schneider and Gonze testified that they were unable to complete the aortobifemoral bypass due to the severely diseased condition of Little's aorta. They stated that the aorta was extremely hard as a result of calcification, and that they had to remove significant portions of the lining of the aorta during the endarterectomy.

---

**3.** With an end-to-end anastomosis, the aorta is cut along the end and the graft is sewn on to the cut end of the aorta. With an end-to-side anastomosis, the graft is sewn to a cut on the side of the aorta.

**4.** End-to-end anastomosis is the generally preferred method because the chance of the bypass staying open longer is higher than with an end-to-side anastomosis. Further, end-to-end anastomosis ensures better circulation to the intermesenteric artery and has a lower risk of eroding into the bowel. Schneider and Gonze testified that, in this case, end-to-end anastomosis was the appropriate method because of Little's severely diseased aorta. End-to-end anastomosis allowed Schneider and Gonze to more easily remove plaque from the aorta before attaching the graft. Schneider and Gonze testified that removing the plaque from the aorta would have been much more difficult, if not impossible, had they attempted an end-to-side anastomosis.

Schneider and Gonze testified that the remaining portion of Little's aorta, after the endarterectomy, was very thin and brittle, and as a result, it was unable to hold sutures. They testified that they attempted to sew the graft to the aorta, but the aorta would not hold the sutures due to its diseased state. Schneider and Gonze, therefore, determined it was appropriate to convert to an axillobifemoral bypass. In an axillobifemoral bypass, the aorta is oversewn and a graft is inserted between the axillary artery and the femoral arteries. Schneider and Gonze successfully completed the axillobifemoral bypass.

Little suffered unexpected complications as a result of the surgery. During the surgery, she lost 5100 ccs of blood, which represented approximately her entire blood volume.[5] After the surgery, Little suffered temporary injuries to the kidneys, liver, heart, and lungs, and permanent injury to her spinal cord. Little is now permanently paralyzed from the waist down and has little bowel and bladder control. Little filed suit, and the trial in the instant case commenced on April 26, 2007.

The cause of Little's injuries was disputed at trial and remains in dispute. At trial, Little argued that her injuries were caused by low blood pressure caused by excessive blood loss during the surgery, and that the excessive blood loss was caused by a mismatch between the size of the graft and the size of her aorta. Specifically, Little argued that Schneider and Gonze breached the standard of care by attempting to sew a 16 × 9 mm graft to a 7–8 mm aorta.[6] Little argued that this size disparity required the surgery to be performed using an end-to-side anastomosis, or alternatively, a smaller graft

---

**5.** Normal blood loss for an uncomplicated aortobifemoral bypass surgery is 500–600 ccs.

**6.** Little also argued that breaches of the standard of care occurred when the doctors used end-to-end rather than end-to-side anastomosis, failed to place a central line, and failed to pack off the area of bleeding. The bulk of testimony at trial, however, focused on the alleged mismatch between the aorta and the graft.

was required for an end-to-end anastomosis. In support of this argument, Little pointed to an operative note dictated by Schneider in which he described Little's aorta as "extremely diminutive measuring 7 to 8 mm in maximal diameter." Little also relied on expert testimony by Dr. Preston Flanigan ("Flanigan"), a vascular surgeon who testified, *inter alia*, as to the size of Little's aorta. Flanigan testified that, based upon an angiogram he had examined, Little's aorta was approximately 8mm.[7]

Schneider, on the other hand, argued at trial that there was no size mismatch between the size of the graft and the size of Little's aorta. Schneider further argued at trial that Little's injuries were caused by a rare but recognized complication caused by the clamping of the aorta during aortobifemoral bypass surgery. Schneider argued that Little's aorta was actually 14–15 mm in diameter (a size for which all experts agreed that the use of a 16 × 8 mm graft would have been appropriate) and that the operative note describing the aorta as 7–8 mm was an error. Schneider testified that he dictated an operative note immediately after the surgery, but that he was notified fifteen days later that the original operative note had been lost. Schneider testified that at that time, he dictated a replacement operative note, in which he mistakenly identified the aorta as 7–8 mm. Schneider stated that the 7–8 mm estimate was actually an estimate of the internal open area of the aorta and not the total diameter of the aorta.

Regarding the cause of Little's injuries, Schneider argued that Little's paralysis was due to the clamping of the aorta.

---

7. The terms "angiogram", "arteriogram", and "aortogram" were used interchangeably throughout trial and in the parties' briefs. An angiogram refers generally to any procedure that uses a contrast agent and x-rays to visualize the flow of blood through any blood vessel. An arteriogram is a procedure that uses a contrast agent and x-rays to visualize the flow of blood through an artery, which is a type of blood vessel. An aortogram is a procedure that uses a contrast agent and x-rays to visualize the flow of blood through the aorta, which is the largest artery in the body. Simply put, an aortogram is a type of arteriogram which is a type of angiogram. In the instant case, all three terms refer to the same type of imaging study.

When the aorta is clamped during surgery, the clamping can interfere with blood flow to the artery of Adamkiewicz, which supplies blood to the spinal cord. Paralysis due to clamping of and interference with the artery of Adamkiewicz is a recognized complication that is known to occur in approximately one tenth of one percent of aortobifemoral bypass surgeries. Schneider argued that injury to the artery of Adamkiewicz, caused by clamping, is what caused Little's spinal cord injury and related paralysis.

A significant issue that arose at trial and is now at issue in this appeal is the admissibility of a January 2007 CAT scan. The trial court did not allow Schneider to introduce Little's 2007 CAT scan, which he argued would have established the size of Little's aorta as 14–15 mm in diameter. Relevant facts regarding the exclusion of the CAT scan are discussed, *infra*. Two other significant issues that arose at trial and are also at issue in this appeal involve the admissibility of evidence of Schneider's lack of board certification and the appropriateness of the trial court's decision to allow Dr. Thomas Dodds, an anesthesiologist, to testify on the issue of causation. Relevant facts related to each of these issues are discussed, *infra*.

The jury returned a verdict against Schneider, Gonze, and Vascular Surgery Associates, awarding damages in the total amount of $3,557,398. The jury returned a verdict in favor of co-defendants anesthesiologist Michael Eves and Northern Chesapeake Anesthesia Associates, P.A. The court entered an order of judgment in favor of Little against Gonze, Schneider, and Vascular Surgery Associates on May 13, 2010. The jury award included $224,398 in past medical expenses, $2,000,000 in future medical expenses, and $1,333,000 for pain and suffering. Following the trial, Schneider and the co-defendants filed a motion for a new trial and motion for reduction of the judgment. The circuit court granted the motion for reduction of the judgment and reduced the noneconomic damages from $1,333,000 to $650,000 pursuant to Section 3–2A–09 of the Maryland Code, Courts & Judicial Proceedings Article, resulting in a total judgment of $2,874,398.00. The circuit court

denied the motion for a new trial. This timely appeal followed.

## DISCUSSION

Summarizing the contentions of the parties, Schneider first argues that the trial court abused its discretion by prohibiting him from introducing a 2007 CAT scan which, Schneider argued, would have accurately established the size of Little's aorta. Little responds that the circuit court properly exercised its discretion to exclude the CAT scan because the CAT scan was not produced during discovery nor was it made available to expert witnesses at the time of their depositions.

Second, Schneider argues that the trial court erred by allowing the introduction of evidence regarding Schneider's lack of board certification. Schneider argues that the introduction of this evidence was both irrelevant and unfairly prejudicial, and therefore, it should have been excluded. Little responds that the circuit court was within its discretion to permit the evidence.

Third, Schneider argues that the trial court abused its discretion in allowing Dr. Dodds, an anesthesiologist, to testify on the issue of causation. Schneider argues that as an anesthesiologist, Dr. Dodds lacked the requisite knowledge and expertise to testify regarding the cause of Little's spinal cord injuries. Little responds that the circuit court acted within its discretion to permit the evidence and that Dr. Dodds had significant experience in the area of spinal cord injuries as the result of surgical complications.

We address each of Schneider's contentions in turn.

## I.

Schneider first argues that the trial court erred by prohibiting the introduction into evidence of a 2007 CAT scan, which, Schneider argued, would have established the true size of Little's aorta. For the reasons set forth below, we agree.

## A. Proceedings Below

One of the central issues of this case was whether there was a size mismatch between the 16 × 9 mm graft used by Schneider and Gonze for the aortobifemoral bypass and Little's aorta. Various evidence was presented by the parties regarding that actual size of Little's aorta. Little pointed to the operative note in which Schneider described Little's aorta as "extremely diminutive measuring 7–8 mm in maximal diameter." Little also presented testimony from an expert witness, Dr. Preston Flanigan, a vascular surgeon, who stated that he "thought that the aortogram was compatible" with an aorta measuring 7–8 mm. Little also referenced other medical records indicating her aorta was small.

Schneider pointed to other evidence suggesting that Little's aorta was significantly larger than 8mm. Schneider testified that, based on an angiogram, Little's aorta was at least 13–14 mms, and noted that an aorta that size would be on the small end of normal.[8] Schneider also testified that a 8 mm graft was used for the axillary artery in the axillobifemoral bypass, and that by definition the aorta must be larger than the axillary artery, given that the aorta is the largest artery in the body. Gonze testified that Little's aorta was at least 12 mm, and Dr. William Suggs, a vascular surgeon, testified that, based on an angiogram and prior 8 mm stent that had earlier been placed inside Little's aorta, he estimated that Little's aorta was 14 mm. Dr. Suggs also testified that a 7 to 8 mm aorta was the size of a pediatric aorta and not an adult aorta. Dr. Marshall Benjamin, a vascular surgeon, testified that based on an angiogram, he estimated Little's aorta to be 14 mm. Dr. Benjamin also testified that he had never seen a 7–8 mm aorta in an adult.

All of the witnesses, however, acknowledged that the angiogram is of limited value in estimating the size of the aorta, given that it only shows the internal area of the aorta and not

---

8. Schneider testified that the normal range of size for a female aorta is between 12 and 25 mm in diameter.

the exterior of the aorta. Therefore, the witnesses acknowledged that while it is possible to estimate the size of the aorta based upon an angiogram, it is not possible to conclusively establish the size of the aorta based exclusively upon an angiogram.

During trial, after Little's experts had finished testifying but before calling Schneider and Gonze as adverse witnesses, Little moved to preclude Schneider from introducing a 2007 CAT scan to attempt to establish the size of Little's aorta. Little's attorney stated that he had realized that, in his opening statement, Schneider's attorney had referred to a CAT scan. Little's attorney now anticipated that Schneider was planning to have witnesses testify regarding the 2007 CAT scan. Counsel for Little argued that the CAT scan should not be admitted because it had not been provided during discovery.

The circuit court held a lengthy hearing on the issue. Little's attorneys argued that they had not been provided with a copy of the CAT scan until April 13, 2010, two weeks before trial, when they received a letter and CD from co-defendant Dr. Eves' attorney. Counsel for Little further argued that none of the expert witnesses, for either the plaintiff or the defense, had mentioned the CAT scan during their depositions. Rather, all of the experts relied upon angiograms as the only source of radiographic imaging. The defendants, Schneider and Gonze, had also not referred to the 2007 CAT scan during their depositions. Little's counsel further argued that it would be very prejudicial to allow the CAT scan evidence to come in at this point, given that Little's experts had already finished testifying and her primary expert on this issue, Dr. Flanigan, had returned to California.

Defense counsel argued that the CAT scan had been performed at Upper Chesapeake Medical Center in January of 2007 and that the written report from the CAT scan had come from the records of Dr. Charles Eck, one of Little's treating physicians. Defense counsel stated that the written report portion of the CAT scan had already been entered into

evidence by Little as part of the records of Dr. Eck and that the CAT scan itself had been produced to Schneider and Gonze during discovery by Upper Chesapeake Medical Center. Little had served a request for production of documents to Upper Chesapeake Medical Center, which was formerly a defendant in this case. Defense counsel stated that they had received a letter from Upper Chesapeake Medical Center, addressed to both plaintiff's counsel and defendant's counsel, in response to the request for production of documents. The response included a letter, dated February 4, 2009, and two CDs. The letter stated that the two enclosed CDs contained an angiogram from August 7, 2001 and an aortogram from June 18, 2007 but did not refer to a CAT scan. Defense counsel stated that although the February 4th letter did not reference a CAT scan, the CAT scan was included on one of the CDs. Little's counsel acknowledged receiving the same February 4 letter and accompanying CDs, but stated that the CDs they received did not contain a CAT scan. Little's counsel maintained that they never received a CD with a CAT scan until April 12, 2010, when they received the CAT scan from Dr. Eves' attorney.

Defense counsel offered to produce the CD and demonstrate to the court that the CAT scan was on the same CD as the aortogram, which defense counsel had received from Upper Chesapeake Medical Center with the accompanying February 4, 2009 letter. The following colloquy ensued:

THE COURT: Does Plaintiff's counsel want that up?

[PLAINTIFF'S COUNSEL]: It's not necessary, Your Honor. I don't have it. That, I know. I have gone through them and I don't have them. Whether [defense counsel's] CD has it or not, I'll take his word for it, but I don't have them.

THE COURT: So, it is not on the CD that you got?

[PLAINTIFF'S COUNSEL]: Again, I'm not a tech. expert either, but I have provided the CD's [sic] that were given to me by Ms. Plant to my experts for review and I have been told that they are not on there.

[DEFENSE COUNSEL]: Your Honor, let me just say I can't speak to that other than the fact that I know that on the two CD's [sic] that were provided those images were on there. We know that their person who did put the aortogram up apparently had a CD and put it up. I can't say that. I can say this, Your Honor.

THE COURT: That is not the critical issue anyway. The critical issue goes to the second part as to what these people [the defense experts and the defendants] have said [at deposition].

The circuit court, after significant argument by the parties, granted Little's motion to exclude the CAT scan testimony, stating:

[C]onsidering everything, I think this is exactly along the lines of where I ruled against the Plaintiff pretrial.[9] I think discovery is there for a reason, it serves a purpose, and I do agree with the arguments of the Plaintiff. I'll adopt document that [sic] and grant the Plaintiff's motion in limine to exclude this [CAT scan].

## B. Standard of Review

 We review a trial court's finding of a discovery violation under the clearly erroneous standard. "When reviewing the circuit court's imposition of sanctions for discovery abuse, we are bound to the court's factual findings unless we find them to be clearly erroneous." *Klupt v. Krongard*, 126 Md.App. 179, 193, 728 A.2d 727 (1999). "Our scope of review is narrow and our function is not to substitute our judgment for that of the fact finder, even if we might have reached a different result." *Id.* Instead, we must "decide only whether there was sufficient evidence to support the trial court's findings. In making this decision, we must assume the truth of all the evidence, and of all the favorable inferences fairly

---

9. Pretrial, the court granted a defense motion to preclude Little from calling an expert witness who was designated significantly beyond the discovery deadline.

deducible therefrom, tending to support the factual conclusions of the lower court." *Id.*

"When considering the actual imposition of discovery sanctions, our review is narrower still." *Id.* We review the granting of a motion *in limine* for discovery sanctions under an abuse of discretion standard. *Saxon Mortgage. Servs. v. Harrison,* 186 Md.App. 228, 252, 973 A.2d 841, 854–55 (2009) (citing *Lowery v. Smithsburg Emergency Med. Serv.,* 173 Md.App. 662, 674, 920 A.2d 546 (2007)). We entrust trial judges "with a large measure of discretion in applying sanctions for discovery violations." *Id.* (internal quotations omitted). The Court of Appeals has identified five factors ("*Taliaferro* factors") that a trial court must consider when exercising its discretion to exclude evidence disclosed in violation of the discovery rules:

(1) whether the disclosure violation was technical or substantial;

(2) the timing of the ultimate disclosure;

(3) the reason, if any, for the violation;

(4) the degree of prejudice to the parties respectively offering and opposing the evidence;

(5) whether any resulting prejudice might be cured by a postponement and, if so, the overall desirability of a continuance.

*Id.* (quoting *Taliaferro v. State,* 295 Md. 376, 390–91, 456 A.2d 29, 37 (1983)). We have recognized that these factors often overlap and therefore "they do not lend themselves to compartmental analysis." *Storetrax.com, Inc. v. Gurland,* 168 Md.App. 50, 89, 895 A.2d 355, 378 (2006). "When a discovery violation· becomes apparent only after the trial has commenced, the potential for prejudice is greater than if the discovery violation had occurred prior to trial." *Id.*

We review a trial judge's decision to limit expert testimony that departs from deposition testimony under an abuse of discretion standard. *Hill v. Wilson,* 134 Md.App. 472, 489, 760 A.2d 294 (2000). It is well established that a

trial judge has the power to exclude trial testimony that constitutes a material departure from what an expert witness testified to at deposition. *Id., supra,* at 481–82, 760 A.2d 294. "When the question is whether there is a material variance between what the witness testified to at deposition and what the witness will testify to at trial, the trial judge's finding of fact will be affirmed on appeals unless the reviewing court is persuaded that the trial judge's finding is clearly erroneous . . . When the question is whether the trial court selected an appropriate remedy [to limit testimony of an expert to what he testified to at deposition], the trial court's remedy of choice will be affirmed on appeal unless the reviewing court is persuaded that the trial court abused its discretion." *Id., supra,* at 489, 760 A.2d 294.

We review a trial court's exclusion of evidence pursuant to Maryland Rule 5–403 under the abuse of discretion standard. "When weighing the probative value of proffered evidence against its potentially prejudicial nature, an abuse of discretion in the ruling may be found where no reasonable person would share the view taken by the trial judge." *Consol. Waste Indus. v. Std. Equip. Co.,* 421 Md. 210, 219, 26 A.3d 352 (2011) (internal quotation omitted).

## C. Exclusion of the CAT Scan

We first consider whether the circuit court erred in finding a discovery violation occurred. We conclude that the court was clearly erroneous in finding that Schneider or his attorneys committed a discovery violation regarding the production of the CAT scan. Second, we consider whether, even if a discovery violation had occurred, the circuit court acted within its discretion to impose a sanction of precluding the use of the CAT scan altogether. We conclude that the trial court did not properly exercise its discretion when it precluded any use of the CAT scan. Third, we consider whether the circuit court acted within its discretion when it prevented expert witnesses from testifying regarding the CAT scan when none had testified regarding the CAT scan in deposition. We conclude that the court was within its discretion to limit the expert testimo-

ny on this issue. Finally, we consider whether there was any basis for excluding the CAT scan as unfairly prejudicial pursuant to Maryland Rule 5–403. We conclude that there was no basis for excluding the CAT scan.

### 1. *Whether a discovery violation occurred.*

■■■ Schneider argues that the circuit court's finding that a discovery violation occurred was clearly erroneous. We agree.[10] There was no evidence presented to indicate that Schneider had committed a discovery violation by failing to disclose the CAT scan. First, the CAT scan was produced during discovery to Schneider from Upper Chesapeake Medical Center, and Schneider reasonably believed that Little was similarly provided with the CAT scan from Upper Chesapeake Medical Center. Moreover, Little, in open court, conceded that Schneider's CD actually did contain the CAT scan when her attorney stated, "Whether [defense counsel's] CD has it or not, I'll take his word for it, but I don't have them."

We agree with Schneider that there was no reason for him to suspect that the CAT scan had not also been produced to Little, and therefore, we conclude that there was no evidence of a discovery violation by Schneider. Accordingly, we find that, assuming *arguendo* the circuit court found a discovery violation by Schneider, such finding was clearly erroneous.

### 2. *Whether the court properly exercised its discretion to exclude the scan.*

■■■ Although we conclude that the court erred in finding Schneider committed a discovery violation, we also hold that, assuming *arguendo* a discovery violation actually had occurred, the circuit court's sanction for the discovery violation constituted an abuse of discretion. Maryland Rule

---

**10.** The circuit court's ruling excluding the CAT scan was not explicit regarding the reason for its exclusion. The circuit court, however, stressed the importance of discovery in its ruling. Accordingly, we assume *arguendo* that the court found a discovery violation had occurred and excluded the CAT scan as a sanction for the discovery violation.

2–433 provides that, once a discovery violation has occurred, a trial court may prohibit a party from entering designated items into evidence. Md.. Rule 2–433(a)(2). However, although we afford the trial court "a large measure of discretion in applying sanctions for failure to comply with [discovery rules]," the trial court must have actually exercised discretion. *Scully v. Tauber*, 138 ·Md.App. 423, 430–31, 771 A.2d 550 (2001) (internal quotation and citation omitted). Therefore, we must first determine whether the trial court exercised its discretion. *Id., supra*, at 431, 771 A.2d 550. The exercise of discretion must be clear from the record, and when it is not clear that the trial court exercised discretion, reversal is required. *Id.* Further, when applying discovery sanctions, a trial court is required to consider the *Taliaferro* factors. *Heineman v. Bright*, 124 Md.App. 1, 7–8, 720 A.2d 1182 (1998).

Here, it is not clear from the record that the circuit court properly considered the *Taliaferro* factors when reaching its decision to exclude the CAT scan. Specifically, the circuit court was required to consider whether the violation was technical or substantial, the timing of the disclosure, the reason for the violation, the degree of prejudice to the parties, and whether the prejudice might be cured by a postponement. *Id.* Here, the circuit court, in making its ruling, simply stated, "I think this is exactly along the lines of where I ruled against the Plaintiff pretrial. I think discovery is there for a reason, it serves a purpose, and I do agree with the arguments of the Plaintiff. I'll adopt document that [sic] and grant the Plaintiff's motion in limine to exclude this." [11]

Although the circuit court had engaged in a lengthy hearing on the issue, during which the parties argued about the timing of the disclosure, whether a discovery violation had occurred, and potential prejudice to the parties, the court did not exercise its discretion in determining an appropriate discovery

---

11. Notably, although both parties address the *Taliaferro* factors in their briefs, neither party brought the *Taliaferro* factors to the circuit court's attention at trial. Nevertheless, the circuit court was required to take these factors into consideration in conducting its analysis regarding the exclusion of this piece of critical evidence.

sanction. Rather, the circuit court excluded the CAT scan based solely upon Little's attorney's statement that he had not received the scan prior to two weeks before trial and Little's representation that her case would be prejudiced. The circuit court failed to consider that Schneider had reason to believe that Little had already received the scan from Upper Chesapeake Medical Center. Moreover, the court did not consider that, at the absolute latest, Little had nonetheless received the CAT scan two weeks before trial yet had failed to raise the issue until after her expert witnesses had completed their testimony.

■■■ We have reversed circuit court rulings that fail to consider the *Taliaferro* factors and make no findings with respect to any of the factors. When a circuit court bases evidentiary rulings on consistent treatment of parties rather than consideration of the *Taliaferro* factors, we will reverse. *See Hart v. Miller,* 65 Md.App. 620, 501 A.2d 872 (1985); *Colter v. State,* 297 Md. 423, 428–30, 466 A.2d 1286 (1983). In *Hart,* we held that the circuit court abused its discretion when it dismissed a case with prejudice when a party failed to comply with a deadline for filing responses to interrogatories. *Hart, supra,* 65 Md.App. at 626, 501 A.2d 872. The circuit court had emphasized the need for consistency in sanctions and failed to consider the specifics of the particular case. *Id.* We stated:

> We disagree, however, with the trial court's interpretation that the objective in cases calling for the exercise of discretion is for the trial judge to be consistent in deciding the sanction to be invoked. If that were the rule, the vesting of discretion in a trial judge, to decide each case on the merits, would be meaningless.

*Id.* In *Colter,* the Court of Appeals held that the circuit court abused its discretion when it "applied a hard and fast rule [ ] of not granting a continuance" when a party violated a discovery rule, without considering the potential prejudice to the parties or the potential resolution of the prejudice by granting

a continuance. *Colter, supra,* 297 Md. at 428–30, 466 A.2d 1286.

We conclude that the circuit court similarly abused its discretion here by failing to consider the required *Taliaferro* factors. Although the circuit court engaged in a lengthy hearing, the court failed to articulate the basis for its ruling and failed to consider alternative sanctions that may have been appropriate. Accordingly, we find that, assuming a discovery violation occurred, the circuit court abused its discretion by failing to consider the *Taliaferro* factors in determining the appropriate sanction for the alleged discovery violation.

In her brief, Little addresses the *Taliaferro* factors and explains how the court could potentially have considered the factors and concluded that exclusion of the CAT scan was an appropriate sanction. We decline to address whether the *Taliaferro* factors, had they been properly considered, could have lead a trier of fact to reasonably conclude that the CAT scan should have been excluded. Rather, we note that the trial court failed to engage in its required discretion, and accordingly, reversal is required. *See Scully, supra,* 138 Md.App. at 431, 771 A.2d 550.

### 3. *Whether the court properly exercised its discretion to limit expert testimony.*

 Having concluded that the circuit court erred in concluding a discovery violation had occurred (and assuming *arguendo* a discovery violation had occurred, the circuit court erred in failing to consider the *Taliaferro* factors when it excluded the CAT scan), we next consider whether the circuit court was within its discretion when it precluded expert witnesses from testifying regarding the CAT scan. Because none of Schneider's expert witnesses had testified regarding the CAT scan in deposition, we conclude that the circuit court was within its discretion to limit the expert testimony on this issue.

█ Maryland Rule 2–402(g) allows a party to require another party, through interrogatories, to disclose the subject matter on which an expert is expected to testify, the substance of the findings and the opinions to which the expert is expected to testify, and the grounds for each of the expert's opinions. Md. Rule 2–402(g). Moreover, it is well established that a trial judge has the power to exclude trial testimony that constitutes a material departure from what an expert witness testified to at deposition.[12] *Id., supra,* at 481–82, 760 A.2d 294. None of Schneider's expert witnesses had disclosed that he would be offering an opinion on the size of Little's aorta based on a CAT scan, nor had any expert testified regarding the CAT scan at deposition. Accordingly, we conclude that the circuit court did not abuse its discretion when it precluded Schneider's expert witnesses from testifying regarding the CAT scan at trial.

We find support for this conclusion in *Hill v. Wilson,* a case in which the trial court excluded testimony by an expert witness when the matter had not been addressed in the expert's deposition. 134 Md.App. 472, 760 A.2d 294 (2000). In *Hill,* at deposition, an expert witness had said that a wheelchair had a problem with a rod across the back, but did not explicitly state that the wheelchair was broken. *Id.* at 489, 760 A.2d 294. The trial court precluded the witness from testifying at trial that the wheelchair was broken. *Id.* On appeal, we stated that this "is simply not a case in which no reasonable person would take the view adopted by the trial court." *Id.* at 490, 760 A.2d 294. The Court noted that "for a discretionary ruling to be reversed, 'the decision under consideration has to be well removed from any center mark imag-

---

**12.** In *Hill,* we explicitly noted that there is a "well established rule that a trial judge has the power to exclude trial testimony that constitutes a material departure from what the witness testified to at deposition." 134 Md.App. at 481, 760 A.2d 294. We note that this rule applies specifically to expert testimony, given the disclosure requirements of Maryland Rule 2–402(g). For witnesses other than expert witnesses, we find no reason to limit their testimony at trial to that which was testified to at deposition when no question that would have elicited such testimony was asked at deposition.

ined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.' " *Id.* (quoting *In Re Adoption/Guardianship No. 3598,* 347 Md. 295, 313, 701 A.2d 110 (1997)).

In the instant case, the experts had not testified at deposition as to the size of Little's aorta based upon the CAT scan. The circuit judge reasonably concluded that testifying as to the CAT scan at trial would be a material departure from the experts' testimony at deposition. As in *Hill,* we believe that the circuit court's decision in this case was not a decision "beyond the fringe of what the court deems minimally acceptable," and therefore, we hold that the circuit court did not abuse its discretion by precluding the expert witnesses from testifying regarding the CAT scan.

We emphasize that, although the circuit court was within its discretion to limit expert testimony regarding the CAT scan, we do not find the circuit court was within its discretion to limit testimony regarding the CAT scan by the defendants Schneider and Gonze. Schneider and Gonze were not testifying as experts and were not subject to the disclosure requirements of Rule 2–402(g). Moreover, although Schneider did not testify at deposition specifically that the CAT scan demonstrated the size of Little's aorta, he did testify that a method to measure the size of an aorta was with "a CAT scan." He did not testify regarding the specific CAT scan at issue here, but significantly, he was never asked a question that would have elicited a response relating to the 2007 CAT scan. We find no basis in Maryland Rule 2–402(g) or *Hill v. Wilson* for precluding the defendants themselves from testifying as to the CAT scan.

### 4. *Whether there was any other basis for excluding the CAT scan.*

Finally, we consider whether there was any other basis for the circuit court to completely exclude the CAT scan. Maryland Rule 5–403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by

the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Md. Rule 5–403. Maryland Rule 5–401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5–401. The CAT scan was clearly relevant. Schneider argued that the CAT scan would have established the size of Little's aorta. The size of Little's aorta was a critical fact at trial, given that a mismatch between the size of the aorta and the 16 × 9 mm graft was the basis of one of Little's allegations of negligence. The CAT scan, which would demonstrate the size of Little's aorta, would certainly make the size mismatch "more or less probable" than without the CAT scan.

The exclusion of the CAT scan cannot be characterized as appropriate under Rule 5–403. There was no contention that the admission of the CAT scan would confuse the issues, mislead the jury, cause undue delay or waste of time, or constitute needless presentation of cumulative evidence. Little argued that she would be unfairly prejudiced if the CAT scan were admitted, but the prejudice Little would have faced is not the type of prejudice contemplated by Maryland Rule 5–403. "The fact that evidence prejudices one party or the other, in the sense that it hurts his or her case, is not the undesirable prejudice referred to in Rule 5–403." *Odum v. State,* 412 Md. 593, 615, 989 A.2d 232 (2010). Rather, "[p]robative value is outweighed by the danger of 'unfair' prejudice when the evidence produces such an emotional response that logic cannot overcome prejudice or sympathy needlessly injected into the case." *Id.* (internal citation and quotation omitted). Here, the CAT scan was greatly probative of whether there was, in fact, a size mismatch between the aorta and the graft, and there is no indication that the admission of the CAT scan would have provoked any type of emotional response or sympathy from the fact finder. Accordingly, we conclude that, if the exclusion of the CAT scan were character-

ized as an exclusion pursuant to the Maryland Rule 5–403, such an exclusion would constitute an abuse of discretion.

Little argues that, because Schneider and Gonze did not rely on the CAT scan to determine the size of Little's aorta prior to or during the aortobifemoral bypass surgery, the CAT scan is not relevant. We acknowledge that the CAT scan was not relevant to Schneider's medical treatment of Little. It is relevant, however, to whether there was a size mismatch between the aorta and the graft. Moreover, Schneider's veracity was called into question when he testified that the 7–8 mm size estimate of the aorta in the operative note was an error. The CAT scan was relevant to whether or not the operative note was, in fact, an error. Had the CAT scan been admitted, Schneider could have pointed to the CAT scan in response to buttress his testimony concerning how he knew that the 7–8 mm size in the operative note was an error.

We are also not persuaded by Little's arguments that admission of the CAT scan would amount to "trial by ambush." Little argues that "the nature of the [CAT] scan, and the inability of Plaintiff's experts to consider it in preparation for trial only increased the prejudice resulting from the Defendant's attempted use of the scan after the Plaintiff's experts had concluded their direct-examination, cross-examination and had left the state to return to their practices." We observe that Little's attorney acknowledged receipt of the CAT scan, at the very latest, two weeks before trial. Moreover, Little's attorney stated that he had heard reference to the CAT scan in defense counsel's opening statement.[13] However, Little waited to raise the issue until after her experts had completed their testimony and had returned to their home states. Admission of the CAT scan would not have amounted to "surprise testimony" that Little had no opportunity to confront.

Accordingly, we conclude that there was no other reasonable basis for exclusion of the CAT scan. Therefore, we hold

---

**13.** In his opening statement, counsel for Schneider stated, "We know that her aorta was not seven to eight millimeters. It can be demonstrated from the CT scans."

that although the circuit court was within its discretion to limit expert testimony, the circuit court erred in precluding the defendants themselves from introducing the CAT scan.

## D. Reversible Error

 Having found that the exclusion of the CAT scan was in error, we next consider whether the error constitutes reversible or harmless error. "It has long been the policy in this state that [appellate courts] will not reverse a lower court judgment if the error is harmless." *Barksdale v. Wilkowsky,* 419 Md. 649, 657, 20 A.3d 765 (2011) (internal citation and quotation omitted). "The burden is on the complaining party to show prejudice as well as error." *Flores v. Bell,* 398 Md. 27, 33, 919 A.2d 716 (2007). A verdict will not be overturned unless the error was likely to have affected the verdict below; and "an error that does not affect the outcome of the case is harmless error." *Id.* The complaining party must demonstrate that the prejudice was "likely" or "substantial." *Barksdale, supra,* 419 Md. at 662, 20 A.3d 765. "[T]he general rule is that a complainant who has proven error must show more than that prejudice was *possible;* she must show that it was probable." *Id.* (emphasis in original).

 Here, Schneider has clearly demonstrated likely or substantial prejudice, and we find that the exclusion of the CAT scan was likely to have affected the verdict below. The CAT scan could have conclusively established the size of the aorta, and therefore, established whether there was or was not a size mismatch between the aorta and the graft. Without the CAT scan, the jury was left to base its opinions about the size of the aorta on Schneider's operative note and the experts' opinions based upon the angiograms. All of the experts, however, conceded that the angiograms were of only limited utility. Because angiograms show only the inside portion of the aorta, there is no way to ensure the accuracy of an estimated external size based upon an angiogram. Little argued in closing: "[A]ngiogram is not a reliable way to determine the size of the aorta. Schneider himself said that." Counsel for Little continued in closing, "Those angiograms

don't tell you the size of the aorta and [the defendants] know it." Given the limited use of the angiograms and the factual dispute concerning whether the operative note contained an error, we believe that the CAT scan would have been extremely useful to the jury in determining whether a size mismatch occurred, and would have likely affected the verdict.

Little argues that because there were multiple allegations of negligence against Schneider and "this case was not solely decided based upon the size of [Little's] aorta," Schneider cannot demonstrate prejudice. We acknowledge that there were various theories of negligence, but we are not persuaded by Little's argument on this point. Although Little also argued that Schneider breached the standards of care by attempting end-to-end rather than end-to-side anastomosis, failing to control bleeding, and failing to place a central line, her key argument revolved around the size mismatch between the aorta and the graft. In Little's opening statement, counsel argued: "[T]he most significant and most severe injury was to her spinal cord, a permanent, devastating injury. All of this stemmed from the blood loss. *All of this stemmed from the decision of Schneider and Gonze to attempt to attach a graft that was twice the size of the aorta to the aorta itself."* (Emphasis added.) We conclude that Schneider has satisfied his burden of showing prejudice by showing the verdict would have likely been influenced by the admission of the CAT scan. Accordingly, we find that the exclusion of the CAT scan constitutes reversible error.

## II.

Schneider argues that the trial court erred when it allowed the introduction of evidence regarding his lack of board certification. Little argues that the trial court was within its discretion to admit the evidence. Little further argues that even if the admission of the board certification evidence was in error, such error was harmless because it did not influence the verdict. For the reasons below, we find that the circuit court committed reversible error by allowing the introduction of evidence of Schneider's lack of board certification.

## A. Proceedings Below

Prior to trial, Schneider moved *in limine* to exclude evidence of his lack of board certification. Schneider explained that at the time he completed his medical training, there was no board certification in vascular surgery. Schneider completed his surgical residency and fellowship in general surgery with a specialization in vascular surgery. At the time of Schneider's medical training, vascular surgery was a part of general surgery and not a separate specialty. Schneider had initially been board certified in general surgery but allowed his board certification in general surgery to lapse because he only practiced vascular surgery and no longer practiced general surgery. After Schneider had completed his training and was practicing as a vascular surgeon, a separate board certification for vascular surgery was created, but Schneider never sought to obtain board certification in vascular surgery.

At the pre-trial motions hearing, Little's counsel argued that Schneider's failure to become board certified had a direct bearing upon his qualifications. Schneider's counsel argued that the evidence regarding Schneider's lack of board certification was irrelevant and unfairly prejudicial, relying upon *Dorsey v. Nold,* 362 Md. 241, 765 A.2d 79 (2001). During the motions hearing, the circuit court acknowledged the possibility that Schneider's attorneys would engage in "puffing" of Schneider, and that Little's counsel would then want to "smudge up [Schneider's] halo a little bit." At that time, the court precluded Little from introducing evidence that Schneider was not board certified, although the court noted that this ruling was subject to reconsideration upon request during the course of the trial.

During opening statements on April 27, 2010, Schneider's attorney discussed Schneider's various credentials and experience. Particularly, he stated that Schneider "was at the forefront of the efforts to build Upper Chesapeake Medical Center and in the efforts to bring a state-of-the-art community hospital to Bel Air ... I would submit to you it is hard to name any physician in this community who had more to do

with the building of that hospital than Schneider." The court again addressed the board certification issue again on April 30, 2010. The court stated, "At this point in time I'm leaning more towards reversing my decision on that because of comments made during the opening statements ... [T]here has been a lot of puffing of [Schneider]. As I said before, if you puff up, you get to puff down." The circuit court then declined to reverse his earlier ruling on the board certification issue, stating "we'll address this again ... if and when we get to that point."

At trial, Little called Schneider as an adverse witness. During cross-examination by defense counsel, Schneider testified regarding his medical training and experience. Schneider also testified that he was on the Board of Directors of the Upper Chesapeake Health System, had been involved with teaching medical students at Johns Hopkins, had authored various publications, and was a member of various professional organizations, including organizations that provide medical care to indigent patients.

Before redirect examination, Little asked the court to reverse its previous ruling on the board certification issue, arguing that she should be permitted to introduce the evidence of Schneider's lack of board certification to counter "all the other puffery that went on in the cross-examination." The circuit court reversed its prior ruling and allowed Little's attorney to question Schneider about his lack of board certification, stating:

> Well, when I made my initial ruling pretrial, which I thought was correct, I did caution everybody it was subject to being revisited, depending on how much puffing went in, and, quite frankly, I am going to use the term puffing, but I am not in any way minimizing these things.

> He is certainly very accomplished. He should be complimented. However, as counsel has indicated, what's the relevance of all those wonderful accomplishments to the issues before the Court? So what's good—there is a bal-

ance here. So if you are going to puff up, they get to puff down.

*　　*　　*

So you can go into [the board certification issue] at this point.

Little's counsel then questioned Schneider regarding his lack of board certification on cross examination. During closing argument, Little's attorney referred to Schneider's lack of board certification, emphasizing, "Every physician who testified in this case was board certified except for Schneider." Little's attorney also argued that Schneider's opinions regarding the importance of board certification served to diminish his credibility.[14]

## B.　Standard of Review

Trial judges are vested with wide discretion with respect to evidentiary rulings, including when "weighing relevancy in light of unfairness or efficiency considerations." *State v. Simms*, 420 Md. 705, 724, 25 A.3d 144 (2011). Trial judges do not, however, have discretion to admit irrelevant evidence. *Id.* Therefore, while the " 'abuse of discretion' standard of review is applicable to the trial court's determination of relevancy ... [T]he 'de novo' standard of review is applicable to the trial judge's conclusion of law that the evidence at issue is or is not of consequence to the determination of the action." *Ruffin Hotel Corp. of Md. v. Gasper*, 418 Md. 594, 619–20, 17 A.3d 676 (2011).

---

14. Little's counsel argued: "I asked Schneider, Board [sic] certification is a big deal, isn't it, doctor? Oh, no, absolutely not. That is not a big deal at all. So, Dr. Suggs, the very expert witness for Schneider, comes in ... Dr. Suggs, you said that you were board certified. We can agree that is not really that big of a deal, is it? Oh, I disagree, it is a big deal. I'm not saying Schneider is a lesser doctor because he is not board certified, but the fact that he would come into this courtroom and try to tell you it is not a big deal to be board certified when his own expert witnesses know that that [sic] is not true tells you about his credibility in this case."

## C. Admission of Board Certification Evidence

██ Schneider argues that the trial court erred by allowing the introduction of evidence regarding Schneider's lack of board certification. Schneider argues that the introduction of this evidence was both irrelevant and unfairly prejudicial, and therefore, should have been excluded. Little responds that the circuit court was within its discretion to permit the evidence. We conclude that Schneider's board certification was not relevant, and therefore, the circuit court erred as a matter of law when it allowed Little to inquire into whether Schneider was board certified.

██ Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5–401. Whether a physician is board certified or not has no relevance as to whether a physician was negligent in a particular case. *Dorsey v. Nold*, 362 Md. 241, 250, 765 A.2d 79 (2001). In *Dorsey*, the Court of Appeals held that a trial court did not abuse its discretion when it failed to admit evidence that a defendant physician had failed a board certification exam. *Id., supra*, at 250–51, 765 A.2d 79. The Court noted that "[a]lthough a physician's failure to pass a board certification examination has been held admissible when the physician testifies as an expert, as being relevant to his or her qualifications as an expert, the general rule is that a physician's inability to pass a medical board certification exam has little, if any, relevance to the issue of whether the physician complied with the standard of care required in his or her treatment of a patient." *Id., supra*, at 250, 765 A.2d 79 (internal quotations and citations omitted). The Court concluded that "the fact of failure [of a board certification examination] makes it neither more nor less probable that the physician complied with or departed from the applicable standard of care in the diagnosis or treatment of a particular patient for a particular condition." *Id., supra*, at 250–51, 765 A.2d 79. Here, Schneider's decision to not seek board certification is even less relevant than the

*Dorsey* physician's failure of a board certification exam. It has no bearing on whether Schneider breached the standard of care in his treatment of Little, and should not have been admitted.

██ Little argues that because Schneider engaged in "puffing," it was reasonable to allow his lack of board certification into evidence. Little argues that the jury would otherwise "only hear favorable testimony regarding Schneider" which would "have been patently unfair and prejudicial to the Plaintiff." Little argues that Schneider opened the door by introducing, over objection, irrelevant but positive evidence, and therefore, she should be permitted to introduce irrelevant but negative evidence regarding his lack of board certification. The Court of Appeals has described the "opening the door" doctrine as follows:

> The doctrine of 'opening the door' gives a party 'the right to introduce evidence in response to (a) admissible evidence, or (b) inadmissible evidence admitted over objection....' *Clark* [*v. State*], 332 Md. [77] at 84, 629 A.2d [1239] at 1242 [(1993)] (quoting JOSEPH F. MURPHY, JR., MARY- LAND EVIDENCE HANDBOOK § 106(D), at 25 (1989)). 'Opening the door' is a rule of expanded relevancy; it allows the admission of evidence that is competent, but otherwise irrelevant, in order to respond to evidence introduced by the opposing party during its direct examination. *Clark*, 332 Md. at 84–85, 629 A.2d at 1242–43. Whether the opponent's evidence was admissible evidence that injected an issue into the case or inadmissible evidence that the court admitted over objection, once the 'door has been opened' a party must, in fairness, be allowed to respond to that evidence. *Clark*, 332 Md. at 85, 629 A.2d at 1243.

*Conyers v. State*, 345 Md. 525, 545–46, 693 A.2d 781 (1997). We acknowledge that evidence that would otherwise be irrelevant may become admissible if a party has "opened the door." However, in order for the "opening the door" doctrine to apply, the opponent must have *"injected an issue* into the case." *Id., supra,* at 545, 693 A.2d 781 (emphasis added).

Here, Little seems to argue that, because Schneider introduced any evidence that reflected upon him positively, any evidence that reflected negatively upon him—here, his failure to obtain board certification—became relevant. We decline to extend the "opening the door" doctrine that far. Schneider did not inject an issue into the case by engaging in "puffing"; rather, he provided typical background information. We find that Schneider did not "open the door" to the admission of evidence regarding his decision not to seek board certification, and the issues surrounding board certification remained irrelevant. Because we hold that Schneider's board certification status was not relevant, we conclude that the circuit court erred as a matter of law when it allowed Little to inquire about whether Schneider was board certified.

## D. Reversible Error

Having found that the circuit court erred by admitting evidence concerning Schneider's lack of board certification, we next consider whether the error constitutes reversible or harmless error. "It has long been the policy in this state that [appellate courts] will not reverse a lower court judgment if the error is harmless." *Barksdale v. Wilkowsky,* 419 Md. 649, 657, 20 A.3d 765 (2011) (internal citation and quotation omitted). "The burden is on the complaining party to show prejudice as well as error." *Flores v. Bell,* 398 Md. 27, 33, 919 A.2d 716 (2007). A verdict will not be overturned unless the error was likely to have affected the verdict below; and "an error that does not affect the outcome of the case is harmless error." *Id.* The complaining party must demonstrate that the prejudice was "likely" or "substantial." *Barksdale, supra,* 419 Md. at 662, 20 A.3d 765. "[T]he general rule is that a complainant who has proven error must show more than that prejudice was *possible;* she must show that it was probable." *Id.* (emphasis in original.)

The Court of Appeals has recognized that precise standards for the harmless error test have not been established. *Id., supra,* at 662, 20 A.3d 765. "The harmless error test is one for which Maryland Courts, like many other jurisdictions, have

declined to establish precise standards ... Instead, we have determined prejudice based on the facts of each individual case." *Id.* The Court recognized that "[i]n some cases, the harmlessness of the error is readily apparent," while other cases "required a more flexible inquiry." [15] *Id., supra,* at 663, 20 A.3d 765. The "reviewing court must focus on the context and magnitude of the error." *Id., supra,* at 665, 20 A.3d 765. However, an appellate court "cannot 'unbake' the jury verdict and examine the impact of any one ingredient." *Id.* Although in civil cases this "difficulty does not give rise to a universal presumption of prejudice, it does shape the applicable harmless error test." *Id.*

The Court of Appeals has recommended a non-exclusive, four-factor list for reviewing courts to consider when determining whether an erroneous jury instruction was prejudicial. The factors include:

(1) the degree of conflict in the evidence on critical issues;

(2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect;

(3) whether the jury requested a rereading of the erroneous instruction or of related evidence;

(4) the effect of other instructions in remedying the error.[16]

*Id., supra,* at 669–70, 20 A.3d 765. The court also noted that "in certain cases, the mere inability of a reviewing court to rule out prejudice, given the facts of the case, may be enough to declare an error reversible." *Id., supra,* at 670, 20 A.3d

---

**15.** The Court of Appeals provided two examples of when the harmlessness of an error is apparent. "[A]n error in evidence is harmless if identical evidence is properly admitted." *Barksdale, supra,* 419 Md. at 663, 20 A.3d 765. "[E]rroneous instructions can be harmless if the Court takes appropriate steps to cure that error." *Id.* Neither of these examples apply in the instant case.

**16.** The Court identified these four factors for appellate courts to consider within the context of erroneous jury instructions. We believe that factors (1) and (2) are relevant in cases involving erroneously admitted evidence. Therefore, we consider the degree of conflict in the evidence on critical issues and whether Little's argument to the jury may have exacerbated the effect of the erroneously admitted evidence.

765. The appellate court must, "in considering these issues, . . . engage in a comprehensive review of the record, and base its determination on the nature of the [error] and its relation to the case." *Id.* In the instant case, we certainly cannot rule out prejudice, and based on a comprehensive review of the record, we find that Schneider has demonstrated that the erroneous admission of the board certification evidence likely affected the verdict.

First, we consider the degree of conflict in the evidence on critical issues. We conclude that this factor weighs strongly toward finding reversible error. There was a great degree of conflict regarding the size of Little's aorta and the accuracy of Schneider's operative note. Moreover, in closing argument, Little specifically referred to Schneider's lack of board certification and his opinions regarding the importance of board certification in order to undermine his credibility. Specifically, Little argued that all of the expert witnesses had stressed the importance of board certification, while Schneider had testified that board certification was not particularly important in his field and that was why he had not sought to obtain board certification. Counsel for Little continued, "the fact that [Schneider] would come into this courtroom and try to tell you it is not a big deal to be board certified when his own expert witnesses know that that [sic] is not true tells you about his credibility in this case." A major issue in this case was whether a size mismatch between the aorta and graft had occurred, and the jury had to determine whether to believe Schneider when he testified that the 7–8 mm description of the aorta in his operative note was an error. Accordingly, Schneider's credibility was a major factor in the determination of this case. We conclude, therefore, that the degree of conflict factor weighs toward finding reversible error.

Second, we consider whether Little's argument to the jury may have exacerbated the effect of the erroneously admitted evidence. Again, Little argued in closing that "[e]very physician who testified in this case was board certified except for Schneider." As discussed above, Little also argued in closing that Schneider's opinions about board certification served to

diminish his credibility. Accordingly, we conclude that the argument to the jury factor weighs toward finding reversible error.

A review of the record demonstrates that Schneider's lack of board certification was stressed throughout trial. While examining each physician witness, both experts and defendants, Little elicited testimony about whether each physician believed that board certification was important. Thereafter, in closing, Little emphasized this point again, both to draw attention to the fact that Schneider was the only physician who was not board certified and to undermine his credibility. We find that this is more than sufficient to demonstrate that the admission of the board certification evidence likely affected the verdict. We conclude, therefore, that Schneider has carried his burden of showing prejudice. Accordingly, we hold that the admission of the board certification evidence constitutes reversible error.

## III.

Schneider argues that the trial court abused its discretion in allowing Dr. Thomas Dodds ("Dodds"), an anesthesiologist, to testify on the issue of causation. Schneider argues that as an anesthesiologist, Dodds lacked the proper expertise to testify as to the cause of spinal cord injuries. Little responds that the circuit court acted within its discretion to permit the evidence and that Dodds had significant experience in the area of spinal cord injuries as the result of surgical complications. We agree with Little and conclude that the circuit court was well within its discretion to permit Dodds to testify on the issue of causation.

### A. Proceedings Below

At trial, Little called Dodds to testify regarding the standard of care for anesthesiologists, causation, and damages. Schneider argued that Dodds should be precluded from testifying as to causation because he was not an expert in the vasculature of the spinal cord. Before the court certified

Dodds as an expert, Little's counsel elicited testimony regarding Dodds' experience and qualifications. Dodds is the Chairman of the Department of Anesthesiology at Dartmouth–Hitchcock University and has significant experience in providing anesthesia to vascular surgery patients. For eight years, he served as the division director for vascular anesthesiology. As division director, Dodds was primarily responsible for creating curriculum and teaching residents in the area of vascular anesthesiology. Dodds testified that 15–20 percent of his practice involves vascular surgery patients, and one of the particular areas of interest within anesthesia is vascular anesthesiology. Dodds has provided anesthesia to patients undergoing aortobifemoral bypass "at least a couple of hundred" times.

Dodds testified that he teaches residents about the prevention of spinal cord injuries during vascular surgery. Dodds testified that he was familiar with the anatomy and function of the cardiovascular system and with the anatomy of the spinal cord. When asked whether he considered himself to be an expert in the anatomy of the spine, Dodds testified:

> In terms of whether or not I do research or lecture nationally, no, I'm not in those terms expert. But I do consider myself as a vascular anesthesiologist, particularly ones that work in the thoracoabdominal aorta, to be an expert in the anatomy and functional anatomy of the spinal cord ... [W]e're the ones that are responsible for trying to maximize blood flow and oxygen delivery relative to the metabolism of the spinal cord in this type of surgery. In fact, when one of our patient's [sic] experiences transient paralysis on a postoperative day, two, three, four or five, which we have seen, the people that they call are the vascular surgeons and the anesthesiologist and we're the ones actually best positioned to do manipulations that potentially might preserve that spinal cord. So in that regard I consider myself expert, yes.

Dodds further testified that he was familiar with the effects of low blood pressure on a patient, the causes of spinal cord

infarctions,[17] and the effect that blood loss can have regarding the risk of spinal cord infarctions during aortobifemoral bypass surgery.

On cross-examination, Dodds admitted that if a patient came to the hospital with a spine or brain injury, a neurosurgeon or neurologist would be consulted rather than an anesthesiologist. Dodds also admitted that at deposition, he had said that certain aspects of blood flow to the spine were outside his area of expertise. On re-direct examination, Dodds testified that although he did not view himself as an expert on the spinal cord in that he did not travel around the country giving presentations about the spinal cord, he did, based upon his qualifications, training, and experience, view himself as an expert in the prevention of spinal cord injuries during surgery. Thereafter, the circuit court accepted Dodds as an expert on the issues of the standard of care for anesthesiologists, causation, and damages.

### B. Standard of Review

We review decisions concerning the admission or exclusion of expert testimony under an abuse of discretion standard. "The decision to admit or exclude 'expert' testimony is within the broad discretion of the trial court and that decision will be sustained on appeal unless it is shown to be manifestly erroneous." *Kleban v. Eghrari–Sabet,* 174 Md. App. 60, 61, 920 A.2d 606 (2007) (citing *Wood v. Toyota Motor Corp.,* 134 Md.App. 512, 520 n. 8, 760 A.2d 315 (2000) (internal quotation omitted)). "The admissibility of expert testimony is a matter largely within the discretion of the trial court and its action will seldom constitute a ground for reversal." *Wood, supra,* 134 Md.App. at 520 n. 8, 760 A.2d 315 (internal quotation and citation omitted).

### C. Dodds' Causation Testimony

Maryland Rule 5–702 provides that a witness must be "qualified as an expert by knowledge, skill, experience,

---

**17.** A spinal cord infarction occurs when the tissue of the spinal cord is deprived of oxygen and dies.

training, or education." Md. Rule 5–702. An expert witness "must have special knowledge of the subject so that the expert can give the jury assistance in solving a problem for which its equipment of average knowledge is inadequate." *Samsun Corporation v. Bennett,* 154 Md.App. 59, 67, 838 A.2d 381 (2003) (internal quotation and citation omitted). "In the area of medical expert testimony, a physician need not be a specialist in order to be competent to testify on medical matters." *Id.* (internal quotation and citation omitted). Schneider argues that the circuit court abused its discretion when it allowed Dodds to testify regarding causation because Dodds lacked expertise in the vasculature of the spinal cord. We disagree. Taking into account Dodds' experience as an anesthesiologist and his experience teaching residents about the prevention of spinal cord injuries during vascular surgery, we conclude that the circuit court did not err in determining that Dodds had sufficient expertise to offer causation opinions.

Schneider's reliance on *Wood v. Toyota Motor Corporation,* 134 Md.App. 512, 760 A.2d 315 (2000), is misplaced. In *Wood,* we held that a trial court had not abused its discretion when it precluded an expert witness from testifying because he was without the minimal competence of knowledge in the area of expertise. *Id., supra,* at 521, 760 A.2d 315. In that case, a plaintiff's expert was not permitted to render opinions in a case involving an alleged design defect in an air bag. The witness had "never (1) designed an air bag system, (2) designed a component for an air bag system, (3) 'been to a plant where air bags or air bag components were manufactured' nor (4) seen a video of air bag components being installed into a vehicle." *Id.* He had also never seen an air bag installation and had not been to any automotive assembly plant since the mid–1980s. *Id.* The witness also had "never (1) 'designed a protocol or a methodology for analyzing an air bag system or an air bag component,' (2) personally saw an air bag deployed, nor (3) 'personally conducted or participated in any type of crash test.'" In contrast, Dodds had extensive experience in the prevention of spinal cord injury during vascular surgery,

and had taught resident physicians about how blood flow and oxygen delivery impact the spinal cord.

We find this case much more similar to *Samsun Corporation v. Bennett,* where we held that the circuit court did not abuse its discretion when it permitted an orthopaedist to testify regarding the cause of a plaintiff's erectile dysfunction even though an orthopaedist is not a specialist in the area of erectile dysfunction. *Samsun, supra,* 154 Md.App. at 72–73, 838 A.2d 381. We stated:

> Although [the orthopaedist], unlike a urologist, is not a specialist in the area of erectile dysfunction, his knowledge, skill, experience, training, and education as an orthopaedist render him capable of testifying as a medical expert in the area. As [the orthopaedist] explained, his field includes the diagnosis of spinal injury and the related symptoms of spinal injury, such as erectile dysfunction. [The orthopaedist] offered the opinion that the appellee's erectile dysfunction was related to the lower back injury suffered at the [defendant's property]. His opinion, therefore, was consistent with his professional experiences and training. Thus, we conclude that the lower court did not abuse its discretion by denying the motion *in limine* and allowing [the orthopaedist] to testify.

*Id.* We find the reasoning of *Samsun* applies to the instant case. Dodds, unlike a neurologist or neurosurgeon, is not a specialist in the area of spinal cord injury. Nevertheless, his knowledge, skill, experience, training, and education as an anesthesiologist render him capable of testifying in this area. The jury was certainly entitled to consider the extent of Dodds' expertise. Schneider's arguments regarding Dodds' qualifications go to the weight of Dodds' testimony and not the admissibility of his expert testimony. Thus, we conclude that the circuit court did not abuse its discretion by denying Schneider's motion *in limine* and allowing Dodds to testify as an expert witness.

**JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY REVERSED; CASE REMANDED TO**

458

THAT COURT FOR A NEW TRIAL. COSTS TO BE PAID TWO-THIRDS BY THE APPELLEE AND ONE-THIRD BY THE APPELLANT.